[S.F. No. 24905. Sept. 7, 1989.]

WILLIAM J. CUMERO, Petitioner, v.
PUBLIC EMPLOYMENT RELATIONS BOARD, Respondent;
KING CITY HIGH SCHOOL DISTRICT ASSOCIATION,
CTA/NEA et al., Real Parties in Interest.

**COUNSEL**

Ronald A. Zumbrun, John H. Findley and Anthony T. Caso for Petitioner.

A. Roger Jeanson, Haas & Najarian, Rex H. Reed, David T. Bryant and Jeffrey D. Wedekind as Amici Curiae on behalf of Petitioner.

Dennis Sullivan, John W. Spittler, Jeffrey Sloan, Andrea L. Biren and Peter Haberfeld for Respondent.

Peter A Janiak, Madalyn J. Frazzini, E. Luis Saenz, Maureen C. Whelon, Marcia L. Meyers, Marci B. Seville, William C. Heath and Harry J. Gibbons, Jr., as Amici Curiae on behalf of Respondent.

Kirsten L. Zerger, Diane Ross, Ramon E. Romero and Christine Bleuler for Real Parties in Interest.

Charles P. Scully, Donald C. Carroll, Charles P. Scully II, Marsha S. Berzon, Michael Rubin, Fred H. Altshuler, George C. Harris, Altshuler & Berzon and J. Albert Woll as Amici Curiae on behalf of Respondent and Real Parties in Interest.

## OPINION

KAUFMAN, J.—The Educational Employment Relations Act (EERA)[1] authorizes a public school district and a labor organization which constitutes its employees' exclusive bargaining representative to agree upon an organizational security arrangement whereby any of the employees who refuse to join the labor organization must pay it a service fee as a condition to continued employment. (§§ 3540.1, subd. (i)(2), 3543.2, subd. (a), 3543.3, 3546.)[2] We granted review in this case to examine the limitations imposed by the EERA and by the First and Fourteenth Amendments upon the uses the organization may properly make of the fee.

As will be explained, we have concluded that the EERA forbids any use of the fee, over the nonmember's objection, for activities beyond the organization's representational obligations, and that many of the uses questioned here are subject to objection under that statutory test, including most

---

[1] Government Code, title 1, division 4, chapter 10.7, section 3540 et seq. Unless otherwise indicated, all further statutory references are to the Government Code.

[2] Section 3540.1, subdivision (i), provides in part: " 'Organizational security' means . . .[¶] (2) An arrangement that requires an employee, as a condition of continued employment, either to join the recognized or certified employee organization, or to pay the organization a service fee in an amount not to exceed the standard initiation fee, periodic dues, and general assessments of the organization for the duration of the agreement, or a period of three years from the effective date of the agreement, whichever comes first." Organizational security is one of the matters within the scope of representation on which public school employers are required to negotiate with their employees' exclusive representative. (§§ 3543.2, subd. (a), 3543.3, 3546.) To be effective, an organizational security arrangement must be agreed upon by both parties to the agreement. (§ 3546, subd. (a).)

lobbying and electioneering expenses as well as the costs of recruiting new members, but that insofar as those uses are permitted by the EERA itself, they do not violate nonmembers' First Amendment rights. We shall further conclude that an organization's authorized affiliate may spend service fee funds in support of the organization's representational obligations, and that the organization has the burden of proving which of its expenses, including funds expended through its affiliates, are chargeable to dissenting employees' fees. We shall also uphold the organization's right under the EERA (apart from codification of the right in Ed. Code, § 45061) to collection of the fees through involuntary payroll deductions pursuant to the organization's agreement with the employer. Finally, we shall direct the Court of Appeal to reconsider the petitioner's application for attorney fees.

## I. FACTS AND PROCEDURAL BACKGROUND

Petitioner William J. Cumero is a high school teacher employed by the King City Joint Union High School District (district) and is within the bargaining unit represented by the King City High School District Association, CTA/NEA (association). As of September 1, 1977, the district and the association, pursuant to the EERA, entered into a one-year collective bargaining agreement that included an organizational security arrangement (see fn. 2, *ante*). In this connection, the agreement provided for mandatory deduction of the service fee from the paycheck of any nonmember teacher.[3]

Dissatisfied with the payroll deduction, Cumero filed an unfair practice charge with the Public Employment Relations Board (PERB), which has broad powers to administer the EERA (§ 3541 et seq.; *San Mateo City School Dist.* v. *Public Employment Relations Bd.* (1983) 33 Cal.3d 850, 856 [191 Cal.Rptr. 800, 663 P.2d 523]). Joined as respondents in the PERB proceeding were the district, the association, and the association's affiliates, the California Teachers Association (CTA) and the National Education Association (NEA). Cumero charged that the amount of the service fee violated the EERA because it exceeded the association's cost of performing its representational obligations to him as a nonmember, that he should not be required to contribute any amount whatsoever to the affiliates because

---

[3] The agreement stated: "Any teacher who is not a member of the Association or who does not make application for membership within thirty (30) days from the date of commencement of teaching duties, shall become a member of the Association or pay to the Association a fee in an amount equal to unified membership dues, initiation fees and general assessment, payable to the Association; provided, however, that the teacher may authorize payroll deduction for such fee in the same manner as provided in paragraph 1 of this Article [pertaining to payroll deduction authorizations by association members]. In the event that a teacher fails to make appropriate payroll authorization, the District shall be empowered to deduct an appropriate amount each payroll period to meet the aforementioned fee."

neither of them is the designated employee representative, and that the district could not lawfully withhold the fee without his consent.

When the charges came before a PERB hearing officer, the parties agreed to focus initially on the question of the activities for which Cumero's service fee could properly be spent, deferring determination of the exact amount of any impermissible expenditure. It was also agreed to confine the testimony to the activities of the CTA during the fiscal year 1977-1978; those activities were deemed typical, for purposes of the hearing, of the activities of the CTA, the NEA, and the local association during the entire period in question. There ensued seven days of hearing, after which the hearing officer issued a proposed decision concluding that some but not all of the expenditures objected to were improper and that the district was not authorized to deduct the service fee from Cumero's salary without his consent. (*Cumero v. King City High School District* (Aug. 29, 1980) PERB Proposed Dec. [4 PERC ¶ 11156] (hereafter PERB Proposed Dec.).)

On exceptions taken by Cumero, the association and the CTA, the case was then considered and decided by PERB itself. Cumero's exceptions included a claim that the use of his service fees to finance certain organizational activities violated his rights not only under the EERA but also under the First Amendment to the United States Constitution.

In its decision (*Cumero v. King City Joint Union High School District* (Mar. 3, 1982) PERB Dec. No. 197 [6 PERC ¶ 13065]) (hereafter PERB Dec. No. 197), PERB defined its task as one of determining the parties' rights under the EERA "on the assumption that the Act suffers no constitutional infirmity," citing article III, section 3.5 of the California Constitution. (*Id.* at p. 4 [6 PERC ¶ 13065, at p. 229].) The cited constitutional provision forbids an administrative agency to declare a statute unconstitutional or to refuse to *enforce* a statute on the ground of its unconstitutionality. As PERB apparently realized, however, the provision did not prevent it from *construing* the EERA in light of constitutional standards. (*Regents of University of California* v. *Public Employment Relations Bd.* (1983) 139 Cal.App.3d 1037, 1042 [189 Cal.Rptr. 298]; see *Goldin* v. *Public Utilities Commission* (1979) 23 Cal.3d 638, 669, fn. 18 [153 Cal.Rptr. 802, 592 P.2d 289]; *Richmond Federation of Teachers* v. *Richmond Unified School District* (Aug. 1, 1979) PERB Dec. No. 99 [3 PERC ¶ 10105, at pp. 327-328].)

PERB first noted that the exaction of a service fee from Cumero conflicts with his right, as a public school employee, "to refuse to join or participate in the activities of employee organizations" (§ 3543), but held that that general provision is modified (in accordance with Code Civ. Proc., § 1859)

by the more particular provisions of sections 3540.1, subdivision (i)(2), and 3546, authorizing organizational security arrangements (fn. 2, *ante*). Noting that the United States Supreme Court had upheld the constitutionality of requiring nonmember employees to contribute to expenses germane to collective bargaining incurred by the labor organization exclusively representing them, both under the federal Railway Labor Act (*Machinists* v. *Street* (1961) 367 U.S. 740 [6 L.Ed.2d 1141, 81 S.Ct. 1784]; *Railway Employees' Dept.* v. *Hanson* (1956) 351 U.S. 225 [100 L.Ed. 1112, 76 S.Ct. 714]) and under a Michigan statute applicable to public school teachers (*Abood* v. *Detroit Board of Education* (1977) 431 U.S. 209 [52 L.Ed.2d 261, 97 S.Ct. 1782]), PERB concluded that "the 'interference' with Cumero's right to refuse to participate in organizational activities resulting from his obligation to pay some service fee is justified by the California Legislature's assessment of the important contribution of organizational security arrangements to the system of employer-employee relations established in the EERA" (PERB Dec. No. 197, *supra,* at p. 10 [6 PERC ¶ 13065, at pp. 230-231]). "To balance Cumero's right against his obligation," PERB continued, "he should not be required to support activities which are beyond the Association's representational obligations," and "[t]he fact that the Constitution does not prohibit certain uses of the service fee does not mean that EERA permits them." (*Id.* at pp. 10-11 [6 PERC ¶ 13065 at p. 231].)

PERB then went on to enumerate various activities for which it concluded the fee could properly be used. Those activities included lobbying and contributions to ballot proposition campaigns on matters affecting the employees' interests in relation to their employer, organizing and recruiting, and organizational publications. PERB approved the inclusion in the service fee of payments to the association's state and national affiliates (CTA and NEA) for representational purposes. PERB also held that Cumero, as charging party, had the burden of proving that uses made of his fee were improper, but that charges based on information and belief could be the basis for a prima facie case, and that Cumero had made a sufficient case to require CTA to go forward with proof of its expenditures.

In addition, PERB upheld the propriety of deducting the fee from Cumero's salary without his consent. Finally, PERB ruled in Cumero's favor that he had been improperly charged for classroom liability insurance which was available only to members, and that there should be further hearings on whether his fees had been improperly used to support candidates' campaigns for public office or for administration of a scholarship fund. Cumero alone sought judicial review of PERB's decision in the Court of Appeal.[4]

---

[4] Section 3542, subdivision (b), provides that a party "aggrieved by a final decision or order of the board in an unfair practice case . . . may petition for a writ of extraordinary relief from such decision or order." Subdivision (c) provides that the "petition shall be filed in the

After PERB's decision, the United States Supreme Court decided *Ellis* v. *Railway Clerks* (1984) 466 U.S. 435 [80 L.Ed.2d 428, 104 S.Ct. 1883], in which the high court determined the propriety of particular uses of non-member service fees by an exclusive bargaining representative under section 2, Eleventh, of the Railway Labor Act (45 U.S.C. § 152, Eleventh). In the present case, the Court of Appeal concluded that the *Ellis* court had strained to construe the Railway Labor Act to avoid conflict with First Amendment rights of employees and that, therefore, only expenses allowed by *Ellis* should be allowed under the EERA unless differences between public-sector and private-sector collective bargaining, suggested by *Abood* v. *Detroit Board of Education, supra,* 431 U.S. 209, should dictate otherwise. Applying this test, the Court of Appeal upheld PERB's approval of using Cumero's fees to finance (1) lobbying and ballot proposition electioneering on matters of employer-employee relations and school financing and (2) any benefits provided by the association's affiliates, CTA and NEA, for which the association itself could properly charge nonmember employees. The court further held that expenses for CTA publications should be allowed only in accordance with the number of lines devoted to chargeable activity as a proportion of the total number of lines.[5] In disagreement with PERB, the court held that nonmembers could not be charged for expenses of organizing and recruiting.

The court agreed with PERB that the district could properly deduct the service fee from Cumero's salary without his consent in accordance with the agreement. As to the burden of proof, the court held that once a dissenting employee has stated a prima facie case of improper use of the service fee, the labor organization must prove how it spent those funds.

district court of appeal," and that "[t]he findings of the board with respect to questions of fact, including ultimate facts, if supported by substantial evidence on the record considered as a whole, are conclusive."

No party or amicus curiae questions that PERB's present decision is one "in an unfair practice case" and therefore reviewable directly by the Court of Appeal under these provisions. PERB has broad powers to investigate and determine "unfair practice charges or alleged violations of this chapter." (§ 3541.3, subd. (i).) The "EERA specifies no 'unfair practices' but only acts that are 'unlawful' (§§ 3543.5, 3543.6) and thus does not segregate unfair practices from other violations." (*San Diego Teachers Assn.* v. *Superior Court* (1979) 24 Cal.3d 1, 13 [154 Cal.Rptr. 893, 593 P.2d 838].) Unlawful acts include interference by public school employers or employee organizations with rights guaranteed by the EERA (§§ 3543.5, subd. (a), 3543.6, subds. (a), (b)), one of which is the right to refuse to join or participate in the activities of employee organizations (§ 3543). Accordingly, a proceeding to challenge an organizational security arrangement before PERB is an "unfair practice case" reviewable under section 3542, subdivisions (b) and (c). (*Link* v. *Antioch Unified School Dist.* (1983) 142 Cal.App.3d 765 [191 Cal.Rptr. 264]; *Leek* v. *Washington Unified School Dist.* (1981) 124 Cal.App.3d 43 [177 Cal.Rptr. 196]; see *San Lorenzo Education Assn.* v. *Wilson* (1982) 32 Cal.3d 841, 853 [187 Cal.Rptr. 432, 654 P.2d 202].)

[5] This limitation on allowable publication expense, derived from *Ellis, supra,* 466 U.S. at pp. 450-451 [80 L.Ed.2d at pp. 443-444], is not now questioned by PERB or the union.

We granted petitions for review filed by Cumero and by PERB, and a petition filed jointly by the association and its affiliates, the CTA and the NEA. For convenience, we refer to briefs and arguments filed or presented by the association, CTA, and NEA collectively as those of the "union."[6] We also use the word "union" in the generic sense of a labor organization representing employees.

## II. EERA's Restrictions on Use of Nonmember Fees

The parties' briefs focus on the constitutional limitations on labor organizations' use of the compulsory fees of objecting nonmembers and argue at length whether the Court of Appeal was correct in treating the restrictions on such use set forth in *Ellis* v. *Railway Clerks, supra,* 466 U.S. 435, as stating a constitutional standard rather than as merely construing the Railway Labor Act. This court, however, "should not decide constitutional questions unless compelled to do so." (*People* v. *Marsh* (1984) 36 Cal.3d 134, 144 [202 Cal.Rptr. 92, 679 P.2d 1033]; accord *People* v. *Williams* (1976) 16 Cal.3d 663, 667 [128 Cal.Rptr. 888, 547 P.2d 1000]; *People* v. *Gilbert* (1969) 1 Cal.3d 475, 481, 484-485 [82 Cal.Rptr. 724, 462 P.2d 580]; *Palermo* v. *Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 65-66 [195 P.2d 1].) Accordingly, we first consider whether and to what extent the EERA allows the challenged uses of Cumero's fees. Insofar as such uses are unauthorized by the statute itself, it will be unnecessary to decide whether they would violate Cumero's constitutional rights.[7]

■ Interpretation of the EERA "falls squarely within PERB's legislatively designated field of expertise. Under established principles, PERB's construction is to be regarded with deference by a court performing the judicial function of statutory construction, and will generally be followed

---

[6] Amicus curiae briefs have been filed on behalf of (1) the National Right to Work Legal Defense Foundation, Inc., (2) the California School Employees Association, and (3) the American Federation of Labor and Congress of Industrial Organizations together with the California Labor Federation, AFL-CIO.

[7] In taking this course, we follow not only our own precedents but also the high court's example in *Ellis,* as seen in the following quotation: "Petitioners' primary submission is that the use of their fees to finance the challenged activities violated the First Amendment. This argument assumes that the [Railway Labor] Act allows these allegedly unconstitutional exactions. When the constitutionality of a statute is challenged, this Court first ascertains whether the statute can be reasonably construed to avoid the constitutional difficulty. [Citations.] As the Court noted when faced with a similar claim in [*Machinists* v.] *Street* [, *supra,* 367 U.S. 740], 'the restraints against unnecessary constitutional decisions counsel against' addressing petitioners' constitutional claims 'unless we must conclude that Congress, in authorizing a union shop under § 2, Eleventh also meant that the labor organization receiving an employee's money should be free, despite that employee's objection, to spend his money' for these activities. 367 U. S., at 749. We therefore first inquire whether the statute permits the union to charge petitioners for any of the challenged expenditures." (466 U.S. at pp. 444-445 [80 L.Ed.2d at pp. 439-440].)

unless it is clearly erroneous. [Citations.]" *(San Mateo City School Dist.* v. *Public Employment Relations Bd., supra,* 33 Cal.3d 850, 856.) "It is, however, 'the duty of this court, when . . . a question of law is properly presented, to state the true meaning of the statute . . . even though this requires the overthrow of an earlier erroneous administrative construction.' *(Bodinson Mfg. Co.* v. *California E. Com.* (1941) 17 Cal.2d 321, 326 [109 P.2d 935].)" *(Gibson* v. *Unemployment Ins. Appeals Bd.* (1973) 9 Cal.3d 494, 498, fn. 6 [108 Cal.Rptr. 1, 509 P.2d 945].)

As PERB points out, the EERA gives public school employees, such as Cumero, "the right to form, join, and participate in the activities of employee organizations of their own choosing," and also "the right to refuse to join or participate in the activities of employee organizations." (§ 3543.) If these were the only relevant provisions, the latter right clearly would be violated by a requirement that a nonmember employee pay a fee to a labor organization as a condition of continued employment. But the EERA also contains provisions expressly declaring organizational security arrangements to be a subject within the scope of representation, authorizing agreements for such arrangements by public school employers and the organizations certified or recognized as the representatives of their employees, and allowing the agreed arrangements (including provisions for compulsory nonmember service fees) to bind all employees within the bargaining unit. (§§ 3540.1, subd. (i), 3543.2, 3543.3, 3546; see fn. 2, *ante*). ■ In accordance with the general principle of statutory construction that a specific provision relating to a particular subject prevails over a general provision on that subject (Code Civ. Proc., § 1859; *Bailey* v. *Superior Court* (1977) 19 Cal.3d 970, 976, fn. 8 [140 Cal.Rptr. 669, 568 P.2d 394]; *People* v. *Gilbert, supra,* 1 Cal.3d 475, 479-480), those specific provisions for organizational security arrangements prevail over the nonmembers' more generalized rights, under section 3543, to refuse to participate in the activities of employee organizations. PERB properly so concluded in the present case.

PERB further concluded that the permissible *amount* of the nonmember service fee is limited not only by section 3540.1, subdivision (i)(2), under which the fee may not exceed the standard initiation fee, periodic dues, and general assessments, but also by "Cumero's residual right not to participate [conferred by § 3543] surviving his obligation to contribute to the Association's costs which are 'germane to collective bargaining.'[8] To balance Cumero's right against his obligation, he *should not be required to support activi-*

---

[8] Here, PERB inserts a footnote to *Machinists* v. *Street, supra,* 367 U.S. 740. The *Ellis* decision states: "At a minimum, the union may constitutionally 'expend uniform exactions under the union-shop agreement in support of activities germane to collective bargaining' [citing *Railway Clerks* v. *Allen* (1963) 373 U.S. 113, 122 (10 L.Ed.2d 235, 242, 83 S.Ct. 1158)]." (466 U.S. at p. 456 [80 L.Ed.2d at p. 447].)

*ties which are beyond the Association's representational obligations.* For this reason, we reject the Association's argument that only constitutional (ideological) considerations apply. The fact that the Constitution does not prohibit certain uses of the service fee does not mean that EERA permits them. PERB must look to the latter to define the permissible range of organizational activities for which Cumero may lawfully be required to pay his fair share through service fees." (PERB Dec. No. 197, *supra,* at pp. 10-11 [6 PERC ¶ 13065 at p. 231], italics added.)

■ PERB thus concludes that the EERA itself gives Cumero the right to refuse to pay a fee for support of the union's activities that are beyond the scope of its obligations as "exclusive representative" (§ 3540.1, subd. (e)). We agree. The purpose for which the EERA authorizes organizational security arrangements is to assure that nonmembers pay their fair share of the labor organization's costs of "performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues" (*Ellis* v. *Railway Clerks, supra,* 466 U.S. 435, 448 [80 L.Ed.2d at p. 442], quoted in *Communication Workers* v. *Beck* (1988) 487 U.S. 735, 762-763 [101 L.Ed.2d 634, 657, 108 S.Ct. 2641, 2657]), and the nonmembers' residual statutory right not to participate entitles them to refuse payment of more than their fair share of such expenses. Those expenses include "not only the direct costs of negotiating and administering a collective-bargaining contract and of settling grievances and disputes, but also the expenses of activities or undertakings normally or reasonably employed to implement or effectuate the duties of the union as exclusive representative of the employees in the bargaining unit" (*Ellis, supra,* 466 U.S. at p. 448 [80 L.Ed.2d at p. 442]).

The representational obligations which an organizational security arrangement may compel nonmembers to support are those imposed by the EERA on the union as exclusive representative. The union is required to meet and negotiate with the "public school employer," i.e., the local school district (§ 3540.1, subd. (k)),[9] on matters within the "scope of representation," i.e., "matters relating to" a broad spectrum of terms and conditions of employment. (§ 3543.2; see *San Mateo City School Dist.* v. *Public Employment Relations Bd., supra,* 33 Cal.3d 850, 859-866; § 3543.6, subd. (c) [unlawful for union to refuse or fail to meet and negotiate in good faith with employer or with employees it exclusively represents].) Section 3543.2, subdivision (a), also gives the teachers' exclusive representative the right to "consult" on educational objectives, course content, curriculum, and textbook selection, but only "to the extent such matters are within the discre-

[9] Subdivision (k) defines "public school employer" or "employer" as "the governing board of a school district, a school district, a county board of education, or a county superintendent of schools."

tion of the public school employer under the law." The union has no right to meet and negotiate with the employer on any matter *outside* the scope of representation, but the employer is not prohibited from voluntarily consulting with the union on any such matter. (§ 3543.2, subd. (a).)[10] As exclusive representative, the union must "fairly represent each and every employee" in the bargaining unit. (§ 3544.9.) These provisions of the EERA implement its stated purposes of "recognizing the right of public school employees . . . to be represented by [their] organizations in their professional and employment relationships with public school employers" and "afford[ing] certificated employees a voice in the formulation of educational policy." (§ 3540.)[11]

### III. Scope of Union's Duty to Avoid Use of Nonmember Fees for Purposes Beyond Its Representational Obligations

■ The fact that an expenditure of the union is for a purpose beyond its representational obligations and therefore not properly chargeable to nonmember service fees by no means precludes the expenditure altogether. The expenditure may well be an appropriate use of union funds received from members in the form of fees, dues, or assessments. If so, it may also be financed out of service fees paid by nonmembers who are sufficiently

---

[10] Subdivision (a) provides: "The scope of representation shall be limited to matters relating to wages, hours of employment, and other terms and conditions of employment. 'Terms and conditions of employment' mean health and welfare benefits as defined by Section 53200, leave, transfer and reassignment policies, safety conditions of employment, class size, procedures to be used for the evaluation of employees, organizational security pursuant to Section 3546, procedures for processing grievances pursuant to Sections 3548.5, 3548.6, 3548.7 and 3548.8, and the layoff of probationary certificated school district employees, pursuant to Section 44959.5 of the Education Code. In addition, the exclusive representative of certificated personnel has the right to consult on the definition of educational objectives, the determination of the content of courses and curriculum, and the selection of textbooks to the extent such matters are within the discretion of the public school employer under the law. All matters not specifically enumerated are reserved to the public school employer and may not be a subject of meeting and negotiating, provided that nothing herein may be construed to limit the right of the public school employer to consult with any employees or employee organization on any matter outside the scope of representation." The remaining subdivisions of the section require the public school employer and the exclusive representative to meet and negotiate, upon the request of either party, regarding disciplinary action other than dismissal (subd. (b)), layoff of teachers for lack of funds (subd. (c)), and payment of additional compensation based on criteria other than years of training and experience (subd. (d)).

[11] Section 3540 states: "It is the purpose of this chapter to promote the improvement of personnel management and employer-employee relations within the public school systems in the State of California by providing a uniform basis for recognizing the right of public school employees to join organizations of their own choice, to be represented by the organizations in their professional and employment relationships with public school employers, to select one employee organization as the exclusive representative of the employees in an appropriate unit, and to afford certificated employees a voice in the formulation of educational policy. . . ."

informed of the proposed expenditure and are given an opportunity to object, yet fail to do so.

In *Teachers* v. *Hudson* (1986) 475 U.S. 292 [89 L.Ed.2d 232, 106 S.Ct. 1066] (*Chicago Teachers*), the United States Supreme Court set forth the procedural safeguards necessary to protect the First Amendment rights of public school employees against improper uses of the fees they are required to pay the union representing them under an "agency shop" arrangement (the term used in *Abood, supra,* 431 U.S. at p. 211 [52 L.Ed.2d at p. 269]). First, the union must furnish the nonmembers with information of its categories of expenditures, verified by an independent audit, sufficient to enable the nonmembers to gauge the extent to which the expenditures would constitute a proper use of nonmember fees. Second, the nonmembers must be given a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker. Finally, any amounts of the fee that are reasonably in dispute must be placed in escrow while such challenges are pending. (*Chicago Teachers, supra,* 475 U.S. at pp. 304-310 [89 L.Ed.2d at pp. 245-249].)

The procedures prescribed in *Chicago Teachers, supra,* 475 U.S. 292, for protecting nonmembers' constitutional rights against a union's improper uses of their agency fees are likewise sufficient and appropriate for protection of nonmember employees' statutory rights to prevent improper use of their service fees collected under an EERA organizational security arrangement. The only limit *expressly* imposed by the EERA on the amount of the nonmember fee the union may collect is that the fee may not exceed the union's standard initiation fee, periodic dues, and general assessments. (§ 3540.1, subd. (i)(2).) That limitation implies a general prohibition against putting the service fees to any use to which the union could not properly put the funds voluntarily paid by its members.

In addition to rights stemming from that general constraint, each nonmember has a right to prevent the use of his or her service fee for purposes beyond the union's representational obligations. Since, as already explained, that additional right is an aspect of the right of an employee to refuse to participate in a union's activities (§ 3543), it must be affirmatively asserted or else it is waived. Accordingly, that right is satisfied if the nonmember is given sufficient information about union expenditures, an opportunity to challenge the amount of his or her financial obligation to the union before an impartial decisionmaker, and protection in the form of an escrow of amounts reasonably in dispute while such challenges are pending, all in accordance with *Chicago Teachers, supra,* 475 U.S. 292.

## IV. LOBBYING AND BALLOT PROPOSITION CAMPAIGN EXPENSES

PERB concluded that Cumero's nonmember service fees could not be used to support or oppose political parties or individual candidates for public office. ■ It approved, however, the use of Cumero's fees for the union's expenses of lobbying, and of ballot proposition campaigns, for or against measures affecting public school teachers' interests with respect to employer-employee relations, regardless of whether the measures pertain to matters on which the union is obliged or entitled to negotiate or consult with the public school employer.

In support of this position, PERB and the union point out that many matters affecting the terms and conditions of public school teachers' employment are beyond the control of the local school districts. The districts' powers are conferred by the Legislature. (Cal. Const., art. IX, § 14.) Though the powers thus conferred are broad (see, e.g., Ed. Code, §§ 35160, 35160.1), the local districts are denied control over many aspects of teachers' terms of employment by detailed provisions in the Education Code governing such matters as initial employment (Ed. Code, § 44830 et seq.), resignations, dismissals and leaves of absence (*id.*, § 44930), computation of salaries (*id.*, § 45022 et seq.), health and welfare benefits (*id.*, § 7000 et seq.), and retirement (*id.*, § 22000 et seq. [State Teachers' Retirement Law]). Since section 3540 subjects the EERA to "other provisions of the Education Code," the employees' representative is prohibited from negotiating with a school district over any contract proposal whereby Education Code provisions would be " 'replaced, set aside, or annulled.' " (*San Mateo City School Dist.* v. *Public Employment Relations Bd., supra,* 33 Cal.3d 850, 864-866.)[12]

The Education Code also directly affects the representative's right to "consult" on educational objectives, curriculum, and textbooks because that right is expressly limited to consultation on matters within the discretion of the school district (§ 3543.2) and the scope of that discretion is controlled by numerous provisions of the code. (See, e.g., Ed. Code, §§ 51000 et seq. [general instructional programs], 60000 et seq. [instructional materials and testing].)

---

[12]The representative may, however, bargain for employee benefits that supplement, without conflicting with, the Education Code's provisions. (*San Mateo City School Dist.* v. *Public Employment Relations Bd., supra,* 33 Cal.3d at p. 865.) Thus, the agreement negotiated for the school year 1977-1978 between the association and the district on behalf of Cumero and his fellow teachers provided for supplementation of various Education Code benefits and further provided that (1) subsequent statutory improvements in negotiable benefits would be incorporated into the agreement and (2) upon reduction of negotiable benefits resulting from amendment or repeal of statutory guaranties, the parties would negotiate for restoration of those benefits.

Finally, since the adoption in June 1978 of Proposition 13, limiting local taxation of real property (Cal. Const., art. XIII A), school districts have become more dependent on appropriations by the Legislature for a major part of their revenue.[13] Moreover, increases in a district's revenue from local taxation may require approval by the electorate. (See Cal. Const., art. XIII A, §§ 1, subd. (b) [two-thirds vote for taxes to pay off bonds for acquisition or improvement of real property], 4 [two-thirds vote for "special taxes"].) Hence, a district's ability to finance salaries and benefits for which its teachers' exclusive representative seeks to negotiate, or improvements in its educational programs as to which the representative exercises its right to consult, depends to a considerable extent upon decisions by the Legislature or by the local or statewide electorate.

PERB and the union contend that in authorizing organizational security arrangements, under which nonmember teachers may be required to pay the union as exclusive representative a service fee "not to exceed" the regular member initiation fees, periodic dues, and general assessments (§ 3540.1, subd. (i)(2)), the Legislature intended that the nonmember contribute not merely to the costs of negotiating and administering collective bargaining agreements with the district, but also to the expenses of other activities necessary to make the collective bargaining process effective on behalf of all the teachers in the bargaining unit. It is claimed that without union lobbying and electioneering on matters affecting school employee interests, the union's bargaining position would be eroded in the face of political activity on behalf of school employers or taxpayer groups. On the other hand, it is argued, benefits won through effective union lobbying and electioneering will enhance labor peace and stability because unions will not have to bargain with the individual districts to obtain those benefits.

The flaw in PERB's position with respect to lobbying and electioneering is its lack of grounding in the EERA itself. With seeming disregard for its own admonition that "[t]he fact that the Constitution does not prohibit certain uses of the service fee does not mean that EERA permits them" (PERB Dec. No. 197, *supra,* at pp. 10-11 [6 PERC ¶ 13065 at p. 231]), PERB proceeds to cite *Abood, supra,* 431 U.S. 209, and other cases as "bar[ring] the use of fees only for such activity whose ideological purpose is unrelated to the representational process" and as "acknowledg[ing] that union involvement in some political activity may be required in pursuit of

---

[13] In fiscal year 1977-1978, California public schools received 53.75 percent of their income from local sources, 37.31 percent from state sources, and 8.94 percent from federal sources. In 1985-1986, the corresponding percentages were 26.15 local, 67.00 state, and 6.85 federal. (See Cal. State Dept. of Ed., Local Assistance Bur., Selected Financial and Related Data for Cal. *Public Schools* (1987) table II-2, p. 27.)

representational objectives."[14] (PERB Dec. No. 197, *supra,* at pp. 14-15 [6 PERC ¶ 13065 at p. 231].) PERB then concludes that "the test" of chargeability to nonmember fees "is not simply the presence of political action but whether employee representation is the underlying purpose of such action." (*Id.* at p. 15 [6 PERC ¶ 13065 at p. 232.) This broad test conflicts with PERB's own holding, with which we agree, that the objecting nonmember "should not be required to support activities which are beyond the Association's representational obligations" (*id.* at p. 10 [6 PERC ¶ 13065 at p. 231]). Those representational obligations are defined by the EERA itself.[15] The EERA's organizational security provisions are intended to ensure that nonmembers pay their fair share of the obligations which the EERA imposes on the union, not to require the nonmembers to finance all union activities which could constitutionally be charged against them.

What are the obligations imposed by the EERA on the union as exclusive representative? As already explained, the union must meet and negotiate with the "public school employer" (§ 3540.1, subd. (k); fn. 9, *ante*) on

---

[14] The *Abood* opinion remarks that "decisionmaking by a public employer is above all a political process" (431 U.S. at 228 [52 L.Ed.2d at p. 280]) and also states: "There will, of course, be difficult problems in drawing lines between collective-bargaining activities, for which contributions may be compelled, and ideological activities unrelated to collective bargaining, for which such compulsion is prohibited. The Court held in *Street* [367 U.S. 740], as a matter of statutory construction, that a similar line must be drawn under the Railway Labor Act, but in the public sector the line may be somewhat hazier. The process of establishing a written collective-bargaining agreement prescribing the terms and conditions of public employment may require not merely concord at the bargaining table, but subsequent approval by other public authorities; related budgetary and appropriations decisions might be seen as an integral part of the bargaining process. We have no occasion in this case, however, to try to define such a dividing line." (*Id.* at p. 236, fn. omitted [52 L.Ed.2d at p. 285].)

The quoted passage seems to imply, at most, only approval of the use of compelled contributions in efforts (1) to obtain "subsequent approval by other public officials" of the collective bargaining agreement itself and (2) to influence "related budgetary and appropriations decisions." It does not indicate approval of such use for political activity to influence decisions on employee-employer matters that the union cannot take up with the employer because they are outside the scope of representation.

[15] How far PERB's broad characterizations of the union's representational obligations depart from the EERA's actual provisions is strikingly illustrated by PERB's reliance on *Eastex, Inc.* v. *NLRB* (1978) 437 U.S. 556 [57 L.Ed.2d 428, 98 S.Ct. 2505]. There, in PERB's words, "[t]he United States Supreme Court, upholding the right of a union to distribute leaflets urging employee action on certain political issues (right-to-work and minimum wages), acknowledged that concerted activity for mutual aid and protection includes seeking improvement of working conditions through channels outside the immediate employer-employee relationship." (197 PERB Dec. No. 197, *supra,* at p. 13 [6 PERC at p. 231].)

In *Eastex,* the high court was construing the provision in section 7 of the National Labor Relations Act which gives workers the right to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection" (29 U.S.C. § 157). What PERB overlooks is that (1) a provision similar to section 7, including the foregoing quoted language, appears in section 923 of the Labor Code, and (2) the EERA expressly provides that its enactment "shall *not* be construed as making the provisions of Section 923 of the Labor Code applicable to public school employees" (§ 3549, italics added).

certain terms and conditions of employment within the scope of representation, and also is entitled to consult with the employer on certain educational and curricular matters insofar as they are within the employer's discretion. (§§ 3543.2, 3543.6.) The union may not, however, negotiate with the employer over matters outside the scope of representation, and in particular, may not negotiate over any contract proposal that would conflict with the Education Code. (§ 3543.2, subd. (a); *San Mateo City School Dist.* v. *Public Employment Relations Bd., supra,* 33 Cal.3d 850, 864-866.) The *employer,* however, may consult any employee or employee organization on any matter outside the scope of representation. (§ 3543.2, subd. (a).)

Thus, the EERA assigns no role to the union in seeking to improve conditions of employment that are not under the control of the local school employer with whom it meets and negotiates. Accordingly, with one possible exception, the costs of efforts to change the law by lobbying before the Legislature, or by campaigning for or against local or state ballot propositions, are outside the union's representational obligations under the EERA and therefore cannot be charged against the fees of objecting nonmembers.

The exception may arise if the employer consults with the union and thereby seeks the union's help in bringing about a legislative change that would affect the employer's powers or resources with respect to some matter within the scope of representation. Since such consultation is contemplated by section 3543.2, subdivision (a), the union has a representational obligation to respond in a manner that in its judgment best serves the interests of all the employees it represents. If some of those employees are nonmembers who are required to pay a service fee under an organizational security arrangement, the costs of such a response, pursuant to representational obligation, may be charged proportionately to those nonmember fees.

For example, if the school employer places on the ballot a proposal for a tax increase that would enable the employer to increase employee compensation, or for a bond issue to build facilities that would affect class sizes or safety conditions of employment, and if the employer enlists the union's help in promoting community support for the proposal, the union's cost of providing such assistance may well be sufficiently related to its representational obligations to be chargeable to the nonmembers. The same might be true of union efforts to support or oppose a measure before the Legislature or the statewide electorate to the extent (1) the efforts are wholly in response to the employer's request for assistance and (2) the measure would affect the employer's powers or resources with respect to one or more matters within the scope of representation.

 Cumero claims that charging him with *any* sort of lobbying or electioneering expense would violate his First Amendment rights. To the

contrary, the constitutional limitations laid down in *Abood* v. *Detroit Board of Education, supra,* 431 U.S. 209, and *Ellis* v. *Railway Clerks, supra,* 466 U.S. 435, would not forbid requiring him to contribute to the costs of a response by the union to the employer's plea to support or oppose legislation or a ballot measure directly affecting matters within the scope of representation. In *Abood,* the court drew a constitutional distinction "between collective-bargaining activities, for which contributions may be compelled, and ideological activities *unrelated* to collective bargaining, for which such compulsion is prohibited" (431 U.S. at p. 236 [52 L.Ed.2d at p. 285], italics added). Moreover, the court recognized that "decisionmaking by a public employer is above all a political process" (*id.* at p. 228 [52 L.Ed.2d at p. 280]) and suggested that "related budgetary and appropriations decisions might be seen as an integral part of the bargaining process" (*id.* at p. 236 [52 L.Ed.2d at p. 285]). The *Ellis* court, in rejecting First Amendment objections to charging dissenting employees with expenses of publications and conventions, concluded that those expenses were "adequately supported by a governmental interest [in industrial peace]" and " 'relat[ed] to the work of the union in the realm of collective bargaining.' [Citation.] The very nature of the free-rider problem and the governmental interest in overcoming it require that the union have a certain flexibility in its use of compelled funds." (466 U.S. at p. 456 [80 L.Ed.2d at p. 447].) Under these guidelines, the union's cooperation with the employer at the employer's request on political activities in furtherance of the union's representational obligations could constitutionally be charged to nonmember service fees.

■ PERB and the union contend, on the other hand, that a legislative intent to allow unions to use nonmember fees, collected under EERA organizational security arrangements, for lobbying or ballot proposition electioneering on *any* matter that affects school employees' interests is demonstrated by a 1982 amendment to the State Employer-Employee Relations Act (SEERA) (§ 3512 et seq.). The SEERA, like the EERA, authorizes organizational security arrangements whereby a state employee who does not join the organization which exclusively represents his unit must pay the organization a fair share fee not to exceed the organization's standard initiation fee, dues, and assessments. (§§ 3513, subd. (j), 3515.7.)

A 1982 amendment to the SEERA added section 3515.8, which provides: "Any state employee who pays a fair share fee shall have the right to demand and receive from the recognized employee organization . . . a return of any part of that fee paid by him or her which represents the employee's additional pro rata share of expenditures by the recognized employee organization that is either in aid of activities or causes of a partisan political or ideological nature only incidentally related to the terms and conditions of employment, or applied towards the cost of any other benefits

available only to members of the recognized employee organization. *The pro rata share subject to refund shall not reflect,* however, *the costs of support of lobbying activities designed to foster policy goals and collective negotiations and contract administration, or to secure for the employees represented advantages in wages, hours and other conditions of employment in addition to those secured through meeting and conferring with the state employer.*" (Italics added; see *Champion* v. *State of Cal.* (9th Cir. 1984) 738 F.2d 1082, cert. den. 469 U.S. 1229 [84 L.Ed.2d 367, 105 S.Ct. 1230] [upholding constitutionality of § 3515.8].)

The substance of the italicized provision of section 3515.8 coincides with PERB's decision in the present case upholding, under the EERA, the union's use of Cumero's service fee for lobbying in furtherance of the interests of the represented employees. Cumero contends that the omission of such a provision from the EERA establishes that the Legislature did not intend it to apply to public school employees. ■ This contention is consistent with the rule that where a statute contains a given provision with reference to one subject, the omission of such provision from a similar statute containing a related subject is significant to show that a different intention existed. (*People* v. *Drake* (1977) 19 Cal.3d 749, 755 [139 Cal.Rptr. 720, 566 P.2d 622].)

The union, on the other hand, points out that section 3515.8 was added to the bill by which it was enacted (Sen. Bill No. 1419) on March 22, 1982, less than three weeks after issuance of PERB's decision in the present case on March 3, 1982. ■ "It is assumed that the Legislature has in mind existing laws when it passes a statute. [Citations.]" (*Estate of McDill* (1975) 14 Cal.3d 831, 837 [122 Cal.Rptr. 754, 537 P.2d 874].) Moreover, the same Legislature enacted Education Code section 45061, providing for salary deductions by school districts of service fees owed under the organizational security provisions of the EERA. ■ " 'The failure of the Legislature to change the law in a particular respect when the subject is generally before it and changes in other aspects are made is indicative of an intent to leave the law as it stands in the aspects not amended.' [Citations.]" (*McDill, supra,* 14 Cal.3d at pp. 837-838.) Thus, suggests the union, the Legislature may have intentionally refrained from adding the substance of section 3515.8 to the EERA because it considered PERB's present decision to have already accomplished that result.

■ We think, however, that the EERA and the SEERA are too disparate to warrant drawing an inference that the 1982 Legislature deemed the SEERA amendment's provisions already incorporated in the EERA. The purposes of the EERA relevant here are essentially two: (1) "[to improve] . . . employer-employee relations *within the public school systems* in the

State of California by . . . recognizing the right of public school employees to . . . be represented by [employee] organizations in their professional and employment relationships *with public school employers*" and (2) "to afford *certificated* employees a voice in the formulation of educational policy." (§ 3540, italics added; fn. 11, *ante.*) The EERA implements the first of these two purposes by regulating employee relations with the *local* school board or school district (§ 3540.1, subd. (k) [defining "public school employer"]; fn. 9, *ante*), within the scope of representation, unless the employer chooses to consult on other matters (§ 3543.2, subd. (a); fn. 10, *ante*). The second purpose, to give certificated employees a voice in educational policy, is implemented simply by entitling "the exclusive representative of certificated personnel" to consult (as distinguished from being consulted) on certain aspects of educational policy "to the extent such matters are within the discretion of the public school employer under the law." (*Ibid.*) Apart from activities stemming from requests for consultation by a school employer (see *ibid.*), none of these provisions indicates or implies any representational obligation of a union to represent employees' interests through lobbying.

The SEERA, on the other hand, declares as its purpose the improvement of employer-employee relations through recognition of "the right of state employees to join organizations of their own choosing and be represented by those organizations in their employment relations *with the state.*" (§ 3512, italics added.) Similarly, a fair share fee collected from nonmembers "shall be used to defray the costs incurred by the recognized employee organization in fulfilling its duty to represent the employees in their employment relations *with the state.*" (§ 3513, subd. (j), italics added.)

The word "state" is not expressly defined in the SEERA. For the limited purpose of the duty to meet and confer in good faith with recognized employee organizations on matters within the scope of representation, the "state employer" is defined as the Governor or his designated representative. (§§ 3513, subd. (i), 3517.) Thus, in enacting the 1982 amendment allowing unions to use nonmember state employee service fees to lobby for conditions of employment "in addition to those secured through meeting and conferring with the state employer" (§ 3515.8), the Legislature may well have had in mind the distinction, embedded in the SEERA since 1977, between a union's specific right and duty to meet and confer with the Governor or the Governor's representative (see §§ 3513, subd. (i), 3517, 3519.5, subd. (c)) and the union's broader right to represent its members in employment relations with the *state* (see §§ 3512, 3515.5), including not only the executive branch but also the Legislature.

Moreover, the very process of meeting and conferring with the Governor's representative may well lead ultimately to union lobbying of the

Legislature. If agreement is reached, the parties must "jointly prepare a written memorandum of . . . understanding, which shall be presented, when appropriate, to the Legislature for determination." (§ 3517.5.) Legislative approval is required if the memorandum of understanding requires the expenditure of funds or conflicts with any statute not specified in section 3517.6.

Thus, even before the 1982 amendment, the SEERA appeared to contemplate that a union's representation of employees "in their employment relations with the state" (§§ 3512, 3515.5) would include attempts to persuade the Legislature, i.e., lobbying. In contrast, a school employee union's representational obligation under the EERA is confined to dealings with the local school employer and limited to matters over which that employer has authority. Accordingly, the schemes of the SEERA and the EERA are not sufficiently similar to warrant our inferring from the SEERA's authorization of the use of nonmember fees for lobbying that a similar use of nonmember fees is allowed under the EERA.[16]

Justice Mosk's dissent, however, asserts that section 3515.8's provision authorizing use of *state* employees' nonmember fees for lobbying must be applied to school employees covered by the EERA because of the following provision in section 3540: "It is the further intention of the Legislature that any legislation enacted by the Legislature governing employer-employee relations of other public employees shall be incorporated into this chapter [EERA] to the extent possible." That provision and the preceding statement of the EERA's purpose (see fn. 11, *ante*) both appear in section 3540 as adopted in 1975. Justice Mosk apparently is of the view that the entire SEERA (§ 3512 et seq.), as enacted in 1977, as well as section 3515.8, added in 1982, was automatically incorporated into the EERA, "to the extent possible," by virtue of section 3540.

There are several answers to this novel, rather startling, theory. In the first place, the quoted provision appears to be an explanation of the Legislature's plans for future legislation, not a vague self-executing direction to incorporate *any* legislation governing public employees' employer-employee

---

[16] We have found no out-of-state decision analyzing statutory provisions similar to those found in the EERA. In his dissent, Justice Arguelles cites one case concerning the SEERA (i.e., *Champion* v. *State of Cal., supra,* 738 F.2d 1082), and two cases (i.e., *Matter of Board of Educ. of Town of Boonton* (1985) 99 N.J. 523 [494 A.2d 279]; *Robinson* v. *State of New Jersey* (3d Cir. 1984) 741 F.2d 598) dealing with a New Jersey provision which, like the SEERA, expressly authorizes lobbying expenditures. The two other decisions cited by Justice Arguelles (i.e., *Abels* v. *Monroe County Educ. Ass'n* (Ind.Ct.App. 1986) 489 N.E.2d 533; *Lehnert* v. *Ferris Faculty Association-MEA-NEA* (W.D. Mich. 1986) 643 F.Supp. 1306) are likewise unhelpful because they focus primarily on constitutional considerations and do not construe limitations, like those found in the EERA, on the scope of a union's representational obligations.

relations into the EERA insofar as possible. Indeed, the indicated legislative plan was implemented when the statute enacting the SEERA (Stats. 1977, ch. 1172) amended the EERA (§§ 3540.1, 3541) to change the name of PERB, which was then charged with administering both the SEERA and the EERA (see § 3513, subd. (g)).

Moreover, even giving literal effect to the quoted provision of section 3540 would not require the application of section 3515.8 to school employees covered by the EERA. Section 3540 states an intention only to "incorporate" certain future legislation into the EERA. Section 3515.8, which Justice Mosk seeks to apply to school employees, applies by its own terms only to *state* employees, which section 3513, subdivision (c), carefully defines in a way that excludes school employees covered by the EERA. To be given the effect sought by Justice Mosk, section 3515.8 would have to be not merely incorporated into the EERA but *adapted* by changing the section's own reference to the employees whom it covers. Yet, as already demonstrated, there are basic distinctions between the respective statutory schemes of the SEERA and the EERA which could well cause the Legislature to regard the use of nonmember service fees for lobbying as appropriate in the case of state employees and inappropriate in the case of local school employees.

Finally, section 3515.8, being confined by its own terms to state employees covered by SEERA, lacks the constitutional prerequisites for amending the EERA so as to cover local school employees. Article IV, section 9, of the California Constitution provides: "A section of a statute may not be amended unless the section is re-enacted as amended." Thus, in *Scott A.* v. *Superior Court* (1972) 27 Cal.App.3d 292 [103 Cal.Rptr. 683], a statute providing that "whenever, in any provision of law, the term '21 years of age' or any similar phrase regarding such age appears, it shall be deemed to mean '18 years of age' " was held ineffective to amend statutes that had not been "re-enacted as amended" (art. IV, § 9). To allow section 3515.8 to be deemed to have amended the EERA because of the vague intention expressed in section 3540 to incorporate future public employee labor legislation into the EERA "to the extent possible" would flagrantly violate article IV, section 9.[17]

---

[17] Justice Mosk's dissent cites Sutherland, Statutory Construction (1985 rev.), section 22.25, page 245, for the proposition that "incorporation of another statute by reference does not amount to an amendment within the meaning of [article IV, section 9]." (*Post*, p. 598.) The cited passage states merely that statutes which adopt provisions of *prior* acts by reference are generally held not to conflict with such a constitutional provision. The dissent, on the other hand, mistakenly insists that the EERA, in section 3540, automatically incorporates *subsequent* legislation.

## V. ORGANIZING AND RECRUITING EXPENSES

PERB held that the union could properly use Cumero's service fee for organizing and recruiting expenses, "at least with respect to those employees covered by [the] EERA." (PERB Dec. No. 197, *supra,* pp. 18-19 [6 PERC ¶ 13065 at p. 232].) It is unclear what PERB intended "organizing and recruiting" to include. PERB states simply that "[t]he goal of all organizing is to bring employees together in pursuit of the common cause." (*Id.* at p. 17 [6 PERC ¶ 13065 at p. 232].)

■ As already explained, costs of organizing and recruiting activities are chargeable to nonmember service fees under the EERA only to the extent those activities are "normally or reasonably employed to implement or effectuate the duties of the union as exclusive representative of the employees in the bargaining unit" (*Ellis* v. *Railway Clerks, supra,* 466 U.S. 435, 448 [80 L.Ed.2d at p. 442]). With that test in mind, we examine various activities that might be deemed included in organizing and recruiting.

In this connection, a distinction must be made between (1) the union's written and oral communications with the employees it represents concerning matters within the scope of its representational duties and (2) activities primarily or exclusively aimed at inducing nonmembers to join the union. Thus, if a union representative talks with represented employees, whether or not they are union members, in order to inform them, or exchange ideas, about some of the union's activities and plans for carrying out its representational duties, the union's cost of such communication may be charged against nonmember service fees, regardless of any incidental effect of the communication upon some nonmember's decision whether to become a union member.

PERB, on the other hand, would compel nonmembers to contribute to the cost of any union effort to recruit new union members from employees covered by the EERA, on the ground that enlargement of the union's membership, locally and statewide, enhances the union's representational effectiveness for the benefit of members and nonmembers alike.[18] PERB

---

[18] PERB explains: "A union's ability to secure representation rights and to maintain them in the face of fluctuating employee attitudes, shifting concerns, and encroaching competitive organizations requires that the organizing activity be ever ongoing. Particularly in view of the acknowledged political aspects of representation in the public sector and the fact that legislation affecting public school employees is almost always applicable on a statewide basis, representational activity in the political arena is likely to be more effective when founded on a broad base of organized employees. [¶] Overall union effectiveness is a factor of membership size and concomitant financial capability. It is from such union strength that the nonmember derives the benefit of representation." (PERB Dec. No. 197, *supra,* at p. 18 [6 PERC ¶ 13065 at p. 232], fn. omitted.)

thereby overlooks its own holding, with which we agree, that an objecting nonmember, such as Cumero, "should not be required to support activities which are beyond the [union's] representational obligations" (PERB Dec. No. 197, *supra,* at p. 10 [6 PERC ¶ 13065 at p. 231]).

PERB and the union argue that increasing the proportionate number of the union's members within the bargaining unit will strengthen its hand at the bargaining table because an elected school board tends to pay more attention to union overtures when the bargaining unit consists mostly or entirely of active members supportive of the union's goals than it would if the unit membership were a passive bare majority. Accordingly, it is argued, intraunit recruiting confers upon the nonmembers a benefit for which they should pay.

The EERA, however, does not entitle the union to use the service fees of objecting nonmembers for just any activity which the union, or PERB, believes would benefit those nonmembers, unless the activity is in furtherance of a representational obligation imposed by the EERA. The union has no EERA obligation to persuade the nonmembers in its bargaining unit to become members. On the contrary, the EERA guarantees each employee in the unit the free choice of joining the union, refraining from participation in any union, or joining a rival union which, under proper circumstances, may be able to institute decertification proceedings against the union currently selected as exclusive representative. (§§ 3543, 3544.5, 3544.7.) Any organization is, of course, free to use its own resources in attempting to influence employees in making these choices, and a union's success in recruiting undoubtedly tends to contribute to its effectiveness in bargaining and in further recruitment. The EERA contemplates, however, that such success will be based on voluntarily financed efforts, not on the service fees extracted from objecting nonmembers.

PERB and the union contend that nonmembers benefit from union recruitment *outside* the bargaining unit because of the widespread practice of tying salaries for a particular bargaining unit to salaries in other school districts. The 1977-1978 agreement between the district and the association for the bargaining unit that included Cumero expressly provided that the salary schedule "shall reflect a comparison" with 10 other districts. Factfinding panels, appointed under the EERA to recommend resolution of a public school employer-union impasse that a mediator cannot settle (§§ 3548, 3548.1), are required to consider a "[c]omparison of the wages, hours, and conditions of employment of the employees involved in the factfinding proceeding with the wages, hours, and conditions of employment of other employees performing similar services and with other employees generally

in public school employment in comparable communities" (§ 3548.2, subd. (b)(4)).

This possible relationship between local public school salaries and those paid in other districts imposes no obligation on the union toward the non-member employees in its bargaining unit to increase the union's membership, or to seek or attain exclusive representative status, in the other districts. Under the EERA, the selection of a particular union as exclusive representative in each bargaining unit is supposed to result from the free exercise (1) by one or more unions of their organizational rights guaranteed by section 3543.1 and related sections, and (2) by employees of their rights to participate or not participate in union activities as they see fit (§ 3543). Only after a union is installed as exclusive representative of a bargaining unit may the union agree with the local school employer on an organizational security arrangement whereby unit employees who have chosen not to join the union are compelled to help finance the union's activities as the exclusive intermediary between them and their employer. But that arrangement cannot be used to make the nonmember employees provide financial support for the union's organizational and representational activities with respect to the employees of *another* employer. The open process by which a union attempts to earn the loyalties of the employees in other districts is not intended to be skewed by compelling unwilling nonmembers to help pay for those efforts just because they happen to work for a wholly different district in a bargaining unit that is subject to an organizational security arrangement.

PERB and the union contend that organizing and recruiting expenses are chargeable to Cumero because the overall size of the union's membership produces two other kinds of benefits. First, it is argued, the effectiveness of the union's lobbying on school-related issues, especially at the statewide level, is enhanced by increasing the size and dedication of the body of union members whom the lobbyist represents. Second, it is said that organizing and recruiting beyond the local bargaining unit provides economy of scale, decreasing the cost per member not only of statewide activity but also of support services to the local unit. Examples of such services, mentioned in PERB's decision (PERB Dec. No. 197, *supra,* at p. 18 [6 PERC ¶ 13065 at p. 232]), are CTA manuals on such subjects as strengthening teachers' negotiating positions, public relations and media access on collective bargaining issues, and organizing the community in support of collective bargaining demands.

As already explained, the union's costs of lobbying or ballot proposition electioneering may be chargeable to the service fees of objecting nonmembers only if the employer enlists the union's help in obtaining or opposing

enactment of some measure related to matters within the scope of representation. The possible beneficial effects of augmenting the union's overall membership upon such political cooperation between the union and the employer, or upon the claimed economies of scale in the provision of support services, are too attenuated to cause organizing and recruiting to become a representational obligation chargeable to objecting nonmembers under an organizational security arrangement. (Cf. *Ellis* v. *Railway Clerks, supra,* 466 U.S. 435, 451-453 [80 L.Ed.2d 428, 443-446].)

## VI. Payments to Affiliated Organizations

The service fees withheld from Cumero's salary during the year 1977-1978, pursuant to the organizational security arrangement set out in footnote 3, *ante,* totaled $152, all of which the district paid directly to the CTA, the association's state affiliate. The CTA in turn retained $107 and transmitted $15 to the local association and $30 to the NEA, the national affiliate.

 Cumero contends his service fees must be confined to amounts received and expended by the local association itself and should not include sums paid to the state or national affiliates. He points out that section 3540.1, subdivision (i)(2), limits the service fee to the "standard initiation fee, periodic dues, and general assessments" of "the recognized or certified employee organization." He argues that the only such organization representing his bargaining unit is the local association, citing a PERB decision holding that the CTA, as affiliate of a local association exclusively representing a school district's employees, "had no obligation to negotiate with the District" (*Fresno Unified School District* v. *Fresno Teachers Association, CTA/NEA* (1982) PERB Dec. No. 208 [6 PERC ¶ 13110 at p. 428]).

PERB rejected Cumero's contention on the ground that payment to affiliates "ultimately inures to the benefit of the service fee payor in his employment relationship" (PERB Dec. No. 197, *supra,* at p. 19 [6 PERC ¶ 13065 at p. 232]), and the Court of Appeal rejected the contention on the ground that its acceptance "would seriously undermine the practice of affiliation[;] [n]othing in the EERA suggests that the Legislature intended such a dramatic effect from . . . section 3540.1, subdivision (i)(2)." The PERB hearing officer, however, rejected the contention on grounds more soundly based on the EERA itself. Section 3540.1, subdivision (d), in defining the statutory phrase "employee organization," declares that the phrase "shall also include any person such an organization authorizes to act on its behalf." The hearing officer concluded that the CTA and NEA, therefore, "can be understood to be authorized by the teachers in the District to be their exclusive representative as surely and as fully as is the local

Association." (PERB Proposed Dec., *supra,* at p. 67 [4 PERC ¶ 11156 at p. 680].)

In oral argument before PERB on exceptions to the hearing officer's decision, Cumero's counsel did not dispute the hearing officer's interpretation of section 3540.1, subdivision (d), but argued that the hearing officer's implicit conclusions that the local association or its members had in fact authorized the CTA and NEA to act on the association's behalf were mere assumptions, supported by "not one shred of evidence." To the contrary, the association's constitution declared the association to be an affiliate of the CTA and the NEA. The 1977-1978 agreement covering the bargaining unit that included Cumero was between the district and "King City Joint Union High School Teachers Association, CTA/NEA" and provided for payment of "unified" membership dues. There was evidence that the CTA supported the local association's representational functions with a variety of administrative and legal assistance, training programs, research, communications, and other services. That this close organizational relationship was widely understood is demonstrated by Cumero's own references to the local association as the "CTA" in his opening testimony before the hearing officer.

The stipulation confining evidence at the PERB hearing to the activities of the CTA as typical of those of the local association was predicated on the assumed propriety of transmitting nonmember service fees to the CTA, to be used for activities in furtherance of the local association's representational obligations. In entering into this stipulation, Cumero's counsel apparently did not intend to waive the alternative contention that section 3540.1, subdivision (i)(2), allows service fees to be received and used only by the particular employee organization recognized or certified as the exclusive bargaining representative. We conclude, however, that section 3540.1, subdivision (d), by expanding the definition of an employee organization to include persons authorized to act on the organization's behalf, was intended to permit a local union to act through an affiliate in discharging the union's representational obligations under the EERA. Accordingly, for purposes of determining nonmembers' rights to object to uses of their service fees under an organizational security arrangement, service fee funds spent by an authorized affiliate in support of the union's representational obligations must be treated as if spent by the union itself.

## VII. Burden of Proof

PERB held (with one member dissenting) that Cumero as charging party had the burden of proving improper uses by the union of his service fee, though he could base a prima facie case on his information and belief derived from such sources as union publications, discussions among

employees, newspaper reports, and financial statements filed with PERB under section 3546.5. PERB also held that Cumero had succeeded in making a sufficient prima facie case to shift to the union the burden of going forward. The Court of Appeal, citing *Railway Clerks* v. *Allen, supra,* 373 U.S. 113, 118-119, 122 [10 L.Ed.2d 235, 239-242], held that the union has not merely the burden of going forward but the burden of persuasion on the issue of what proportion of its expenditures is properly chargeable to dissenters.

In *Chicago Teachers, supra,* 475 U.S. 292, decided after the instant case had been fully briefed in this court, the United States Supreme Court considered what procedures are constitutionally necessary to assure that a union does not use dissenting employees' service fees for any purpose that violates those employees' constitutional rights. Citing *Abood* v. *Detroit Board of Education, supra,* 431 U.S. 209, 239-240, fn. 40 [52 L.Ed.2d 261, 287, fn. 40], and *Railway Clerks* v. *Allen, supra,* 373 U.S. 113, 122 [10 L.Ed.2d 235, 241-242], the *Chicago Teachers* court reiterated that the union has what amounts to the burden of persuasion, i.e., the burden of proving the proportion of "political" (i.e., nonchargeable) expenses to total union expenses. "The nonmember's 'burden' is simply the obligation to make his objection known." (475 U.S. at p. 306, fn. 16 [89 L.Ed.2d at p. 247, fn. 16].)

We have held hereinabove that nonmember employees' right to prevent the union's use of their service fees for purposes not authorized by the EERA requires that those employees be afforded the procedural safeguards prescribed in *Chicago Teachers.* Hence the holding of that case as to burden of proof governs here.

## VIII. INVOLUNTARY PAYROLL DEDUCTION OF SERVICE FEE

Education Code section 45061, enacted in 1982, requires school districts to deduct a service fee from the paycheck of each employee required to pay the fee under an organizational security arrangement, unless the employee chooses to pay the fee directly to the exclusive representative. When the present case was decided by PERB, however, that provision was not yet in effect. Cumero contends that until the provision's effective date (Jan. 1, 1983) it was illegal for the district to deduct the service fee from his salary (as provided by the district's agreement with the union) without his consent.

PERB held (with one member dissenting) that allowing a dissenting employee to withhold consent for the deduction of his or her service fee would be inconsistent with the mandatory nature of the fee and, further, would enable the employee to circumvent the organizational security ar-

rangement, create unduly burdensome collection problems, and ultimately lead to enforcement of the employment termination provision of section 3540.1, subdivision (i)(2), which makes payment of the fee a condition of employment. The Court of Appeal concluded that in the absence of a statute affirmatively precluding the involuntary payroll deduction, PERB's conclusion that an organizational security arrangement could provide for such deductions was reasonable and correct.

Cumero relies on a 1977 Attorney General's opinion (60 Ops.Cal.Atty.Gen. 370) on the consequences of an organizational security arrangement that required nonmembers of the employees' exclusive representative to pay a service fee "as a condition to continued employment" but contained no provision for involuntary payroll deductions of the fee. The opinion concluded that such involuntary deductions were impermissible because not affirmatively authorized by statute.

PERB's present decision disagreed with this opinion of the Attorney General. PERB held that section 3540.1, subdivision (i)(2), which describes an organizational security arrangement as one requiring nonmember payment of service fees "as a condition of continued employment," expresses only the *limits* of permissible negotiations on service fees and does not prescribe termination of employment as the *only* means of enforcement.

Citing that conclusion by PERB, this court held in *San Lorenzo Education Assn.* v. *Wilson, supra,* 32 Cal.3d 841, that under an organizational security arrangement making the employee association, rather than the employer, responsible for enforcing the service fee obligation, the association could recover the fees by civil suit in small claims court. Similarly here, PERB upheld the provisions for involuntary payroll deductions of the service fee in the arrangement covering Cumero (fn. 3, *ante*) as within the outer limits of section 3540.1, subdivision (i)(2), and therefore permissible. Giving due weight to PERB's statutory construction, we conclude that enforcement of the agreement's provision for involuntary deduction of Cumero's service fee from his salary was proper under the EERA even before such deductions became expressly authorized by Education Code section 45061.

## IX. ATTORNEY FEES

Cumero seeks an award of attorney fees under Code of Civil Procedure section 1021.5, which authorizes a court to award such fees to a successful party in an action resulting in the enforcement of an important right affecting the public interest if a significant benefit has been conferred on the general public or a large class of persons, the necessity and financial

burden of private enforcement are such as to make the award appropriate, and such fees should not in the interest of justice be paid out of the recovery, if any. The section applies to the present proceeding for review of a PERB decision by extraordinary writ relief (§ 3542, subd. (b); fn. 4, *ante*). (Code Civ. Proc., § 1109.) Though the application for fees was denied by the Court of Appeal, Cumero's right to fees must be reconsidered in light of our present decision, which substantially modifies that court's rulings. (*Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 948 [154 Cal.Rptr. 503, 593 P.2d 200].) Moreover, it is that court which must determine the matter since any fee award must be made by "a court" (Code Civ. Proc., § 1021.5), and initial judicial review was by the Court of Appeal. (*Harbor* v. *Deukmejian* (1987) 43 Cal.3d 1078, 1103 [240 Cal.Rptr. 569, 742 P.2d 1290]; *Planned Parenthood Affiliates* v. *Swoap* (1985) 173 Cal.App.3d 1187, 1202 [219 Cal.Rptr. 664].)

## X. CONCLUSION

The judgment of the Court of Appeal is reversed, and the cause is remanded to that court for further proceedings consistent with this opinion.

Lucas, C. J., Panelli, J., and Eagleson, J., concurred.

**MOSK, J.**—I dissent. I disagree with the majority's conclusion that the Educational Employment Relations Act (EERA; Gov. Code, § 3540 et seq.)[1] prohibits service fees paid by nonunion members from being used for lobbying and electioneering unless the employer invites the union to participate in promoting public support for a measure. This somewhat odd result is, in my view, both unprecedented and erroneous. The EERA does not justify it; indeed, its provisions are to the contrary.

First, I disagree with the majority's conclusion that the EERA does not incorporate section 3515.8 of the State Employer-Employee Relations Act (SEERA) which authorizes the use of nonmember fees to support certain lobbying activities by the union. (Maj. opn., *ante*, at p. 598 et seq.) Section 3540 of the EERA provides that legislation governing employer-employee relations "*of other public employees*" (i.e., other than school employees) must be incorporated into the EERA "to the extent possible." The majority refuse to follow this statutory direction for incorporation on the ground that the SEERA applies to state employees rather than school employees. But this reasoning is obviously flawed. The EERA expressly provides for the incorporation of provisions that do *not* relate to school employees, so long as they cover public employees. In order to resist incorporation, the

---

[1] All statutory references are to the Government Code unless otherwise noted.

majority must demonstrate that state employees are not public employees, or that it is impossible to incorporate the provisions of section 3515.8 into the EERA. This the majority do not even attempt to do.[2]

Even less justified is the holding of the majority that the incorporation by reference of the SEERA provision in the EERA would violate the constitutional prohibition against amendment of a statute without reenactment as amended. (Cal. Const., art. IV, § 9.) It is settled that incorporation of another statute by reference does not amount to an amendment within the meaning of the constitutional provision. (Sutherland, Statutory Construction (1985 rev.), § 22.25, p. 245.) If the majority are correct, then the large number of statutes which incorporate others by reference would also be unconstitutional.

Furthermore, the majority make the unjustified assumption that incorporation of the SEERA provision would amount to amendment of the EERA. There is no provision of the EERA which states that nonmember contributions cannot be used for lobbying. This is just an inference which the majority draw in the process of balancing certain provisions of the EERA against one another. California Constitution Article IV, section 9, was not intended to apply to such a situation. Its purpose is " 'to avoid the confusion which almost always results when amendments are attempted by way of directing the insertion, omission or substitution of certain words, or by adding a provision, without setting out the entire context of the section to be amended.' " (*Scott A.* v. *Superior Court* (1972) 27 Cal.App.3d 292, 295 [89 L.Ed.2d 232, 106 S.Ct. 1066].) The constitutional provision does not apply to "self-sufficient and complete legislative pronouncements, even if they might be said to 'amend' other earlier acts by implication." (*Glendale Unified School Dist.* v. *Vista del Rossmoyne Co.* (1965) 232 Cal.App.2d 493, 498 [42 Cal.Rptr. 899].) The *Scott* case, on which the majority rely, involved the first situation. The incorporation commanded by section 3540 involves the second. It does not insert, omit, or substitute any words to an existing statute; it is a complete legislative pronouncement. Therefore, by requiring incorporation of the provisions of the SEERA insofar as possible, the Legislature cannot be said to have amended the EERA.

In addition, the majority, in my view, take far too narrow a view of the functions of a labor union as the collective bargaining representative of the employees. As I understand it, they reason as follows: A balance must be

---

[2] The fact that section 3513, subdivison (c), of the SEERA defines the term "state employee" to exclude school employees is irrelevant to the incorporation issue not only because the EERA provides for the incorporation of provisions relating to public employees other than nonschool employees but also because the definitions stated in section 3513 are only for the purposes of applying the SEERA, not the EERA. The introduction to the section states that the provisions of the section are for the purposes of defining the terms as "used in this chapter."

made between the provision of the EERA that a nonunion member may refuse to join or participate in union activities (§ 3543) and the provision authorizing organizational security arrangements (§§ 3540.1, subd. (i)(2), 3546). In order to achieve this balance, the fees of a nonmember may be used only to support those activities that the union is required to undertake pursuant to its representational obligations as defined by the EERA. Since the obligation of the union under the act is only to meet and confer with the employer as to the terms and conditions of employment (§ 3540.1, subd. (h)), the union is entitled to use a nonmember's fees only for the purpose of fulfilling this duty. However, because the act also allows the employer to "consult" on educational objectives to the extent such matters are within the employer's discretion, if the employer invites the union's participation, the union may also use nonmember fees for the purpose of fulfilling this consultation function. In addition, if the employer seeks the union's help in bringing about political change that would affect the employer's resources within the scope of representation, then the union may use nonmember fees to promote community support for the proposal because its cost of providing such assistance may be "sufficiently related to its representational obligations to be chargeable to the nonmembers." (Maj. opn., *ante,* p. 594.)

But nothing in the EERA restricts use of a nonmember's fees for political activities or justifies restrictions on the use of such fees to activities which the union is required to conduct under the act. The majority infer such a restriction from the provision allowing an employee to refuse to join the union, but they do not explain why the balance between nonmembers' rights and a union's obligations under the act justifies this restriction. In my view, the nonmembers' rights are sufficiently vindicated by preventing their contributions from being used for political activities not related to the welfare of school employees.

But even if the majority's premise that nonmember fees may be used only to defray the cost of activities required of the union under the EERA were correct, I disagree with the conclusion they draw from that premise, i.e., that such fees may not be used to cover the cost of advocating measures of benefit to school employees unless the union's participation is invited by the employer and the matter is within the scope of representation.

The majority take an unjustifiably narrow view of a union's representational obligations. The primary reason for requiring a nonmember to contribute to the cost of a union's activities is to avoid giving him a "free ride." That is, to obtain the benefits of the union's participation as exclusive bargaining agent without paying his fair share of the costs incurred in carrying out this function. (*Ellis* v. *Railway Clerks* (1984) 466 U.S. 435, 446 [80 L.Ed.2d 428, 441, 104 S.Ct. 1883].) The restrictions imposed by the majority do not give adequate recognition to this purpose. For example, if

the union were to advocate more advantageous rules relating to dismissal of teachers—a subject over which it may not bargain under the EERA (§ 3540; Ed. Code, § 44932 et seq.), and a matter as to which the employer cannot realistically be expected to invite the union's assistance—why should not the nonmember employee be required to contribute to such an effort which, if successful, would clearly benefit him?

Furthermore, although *Ellis* recognizes that the appropriate test applicable to the use of a nonmember's fee is whether he should be required to contribute to the cost of the union's performance of its "function of exclusive bargaining agent" (466 U.S. 435, 446 [80 L.Ed.2d 428, 441]), and this is the same test employed by the majority here, the United States Supreme Court takes a broader view of the scope of such activities than do the majority. *Ellis* holds that a nonmember must contribute his fair share not only for the cost of negotiating and administering a collective bargaining agreement and of settling disputes, but also for activities "normally or reasonably employed to implement or effectuate the duties of the union as exclusive representative. . . ." (*Id.* at p. 448 [80 L.Ed.2d at p. 442].) The high court concludes that a nonmember's dues may be used to support the cost of holding a union's national convention, to print and distribute its monthly magazine, and to purchase refreshments for union meetings and social functions.

It seems clear that if a nonmember's fees may be used to fund these activities on the ground that they are reasonably related to the union's function as exclusive bargaining agent, the use of the fees to advocate benefits for all school employees also meets this test. Thus, in the context of the "free ride" rule, which is the underlying justification for the use of nonmember contributions by a union, the fact that the union under the EERA may not directly negotiate with the employer regarding a particular benefit and is not invited by the employer to promote a measure relating to its representational obligations should not prevent it from using nonmember fees to promote political activities on behalf of school employees.

I would hold that a nonmember's contributions may be used to pay for the cost of lobbying and ballot proposition campaigns so long as those activities have as their goal the promotion of the welfare of school employees.

**ARGUELLES, J.,**\* Dissenting.—Unlike Justice Mosk, I do not think that Government Code section 3540,[1] the introductory provision of the Educa-

---

\* Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

[1] Section 3540 provides in full: "It is the purpose of this chapter to promote the improvement of personnel management and employer-employee relations within the public school systems in the State of California by providing a uniform basis for recognizing the right of

tional Employment Relations Act (EERA), may properly be interpreted to incorporate into EERA a subsequently enacted provision of the State Employer-Employee Relations Act (SEERA), section 3515.8. On that point, I agree with the majority opinion that, in context, the relevant portion of section 3540 "appears to be an explanation of the Legislature's plans for future legislation" (maj. opn., *ante*, p. 598), rather than a self-executing provision which automatically amends EERA any time any provision governing employer-employee relations of other public employees is subsequently enacted.

Nonetheless, I agree completely with Justice Mosk's conclusion that the majority opinion is in error in interpreting the relevant provisions of EERA to preclude a union which has been certified as an exclusive representative from using service fees collected from nonunion members for lobbying on legislative measures directly related to the working conditions of the employees it represents. The language of the specific provision of EERA which is addressed to the "free rider" problem—section 3540.1, subdivision (i)(2)[2] —contains no hint that an exclusive representative's use of such funds was intended to be limited in such a fashion, and because nonunion members, as well as union members, will reap the benefits of the union's lobbying efforts

---

public school employees to join organizations of their own choice, to be represented by the organizations in their professional and employment relationships with public school employers, to select one employee organization as the exclusive representative of the employees in an appropriate unit, and to afford certificated employees a voice in the formulation of educational policy. This chapter shall not supersede other provisions of the Education Code and the rules and regulations of public school employers which establish and regulate tenure or a merit or civil service system or which provide for other methods of administering employer-employee relations, so long as the rules and regulations or other methods of the public school employer do not conflict with lawful collective agreements.

"It is the further intention of the Legislature that this chapter shall not restrict, limit, or prohibit the full exercise of the functions of any academic senate or faculty council established by a school district in a community college to represent the faculty in making recommendations to the administration and governing board of the school district with respect to district policies on academic and professional matters, so long as the exercise of the functions does not conflict with lawful collective agreements.

"*It is the further intention of the Legislature that any legislation enacted by the Legislature governing employer-employee relations of other public employees shall be incorporated into this chapter to the extent possible.* The Legislature also finds and declares that it is an advantageous and desirable state policy to expand the jurisdiction of the board created pursuant to this chapter to cover other public employers and their employees, in the event that this legislation is enacted, and if this policy is carried out, the name of the Educational Employment Relations Board shall be changed to the 'Public Employment Relations Board.'" (Italics added.)

Unless otherwise noted, all further section references are to the Government Code.

[2] Section 3540.1, subdivision (i) provides in part: " 'Organizational security' means . . . [¶] "(2) An arrangement that requires an employee, as a condition of continued employment, either to join the recognized certified employee organization, *or to pay the organization a service fee in an amount not to exceed the standard initiation fee, periodic dues, and general assessments of the organization* for the duration of the agreement, or a period of three years from the effective date of the agreement, whichever comes first." (Italics added.)

with regard to employment-related legislation, the overall purpose of the legislative provision supports the use of service fees for such efforts. Even a cursory review of California's extensive Education Code demonstrates the extent to which public school employees' working conditions are governed or affected by specific legislation, and thus it appears particularly anomalous to read into EERA a limitation that exempts nonunion public school employees from paying their fair share of lobbying efforts conducted by their exclusive representative on their behalf.

The majority opinion reaches a contrary conclusion as a matter of statutory interpretation, but it points to nothing in the statutory language or legislative history of EERA to suggest that the Legislature intended to limit an exclusive representative's use of service fees in the manner prescribed by its opinion. While the majority opinion (see maj. opn., *ante,* pp. 586-587) purports to give "deference" to the interpretation of the legislation by the Public Employment Relations Board (PERB), the expert administrative agency charged with the administration of this statute, in the end the majority opinion squarely rejects PERB's application of the statute with regard to lobbying expenses on employment-related measures.

In my view, the majority's rejection of PERB's application of the statute with respect to lobbying expenses is unwarranted, and does not accurately reflect the Legislature's intent with respect to the use of service fees for such activities. Indeed, I believe the legislative history of section 3515.8, the provision of SEERA briefly referred to above, reveals quite clearly that the majority's interpretation of EERA is contrary to the legislative design.

PERB issued its decision in this case on March 3, 1982, interpreting the relevant provisions of EERA as authorizing a union to charge nonunion members for the expenses of lobbying, and of ballot proposition campaigns, for or against measures affecting public school employees' interests with respect to matters of employer-employee relations. (*Cumero v. King City High School District Association, CTA/NEA et al.* (Mar. 3, 1982) PERB Dec. No. 197, at pp. 14-17, 35 [6 PERC ¶ 13065, at pp. 231-232, 235].) Less than three weeks later, on March 22, 1982, a bill proposing changes in SEERA which was then pending in the Senate was amended to add a new provision, section 3515.8, which provided: "Any state employee who pays a fair share fee shall have the right to demand and receive from the recognized employee organization . . . a return of any part of that fee . . . which represents the employee's additional pro rata share of expenditures by the recognized employee organization that is either in aid of activities or causes of a partisan political or ideological nature only incidentally related to the terms and conditions of employment, or applied towards the costs of any other benefits available only to members of the recognized employee organization. *The pro rata share subject to refund shall not reflect, however, the*

*costs of support of lobbying activities designed to foster policy goals and collective negotiations and contract administration, or to secure for the employees represented advantages in wages, hours and other conditions of employment in addition to those secured through meeting and conferring with the state employer."* (Sen. Bill No. 1419 (1981-1982 Reg. Sess.) § 5, as amended Mar. 22, 1982.) (Italics added.) As amended, the bill was enacted into law. (Stats. 1982, ch. 1572, § 5, p. 6200.) By adopting section 3515.8 in this form, the Legislature specifically extended to exclusive representatives governed by SEERA the same rights which PERB had concluded that EERA gave to exclusive representatives in the public school sector.

The majority opinion suggests that because the Legislature did not add the same language to EERA that it added to SEERA in section 3515.8, EERA cannot properly be interpreted as granting such rights to the exclusive representatives governed by EERA. With all respect, I believe that in light of the legislative history of section 3515.8, the majority's position belies reality. The timing of the enactment of section 3515.8 indicates quite plainly that the unions which represent state employees wanted to be assured that they would be operating under the same ground rules which PERB had concluded that EERA provided for the unions governed by that act. Although the majority opinion posits some reasons which might theoretically have motivated the Legislature to create different rules for EERA and SEERA (see maj. opn., *ante,* pp. 596-598), the opinion fails to point to anything in the legislative history of the SEERA amendment to indicate that the Legislature actually had any such intent when it enacted the provision. Furthermore, the portion of section 3540 on which Justice Mosk's dissent relies (quoted at fn. 1, *ante*)—even if not self-executing—plainly demonstrates that in the public labor relations arena the Legislature has pursued a general policy of according equal treatment to the labor organizations that operate under each of the statewide public employment labor relations acts. Viewing all of the related statutory provisions in realistic terms, I cannot agree with the majority's conclusion that the Legislature has consciously chosen to provide different anti-free-rider protection to unions under EERA than that accorded unions under SEERA.

Finally, the majority opinion fails to persuasively distinguish the recent out-of-state decisions which have uniformly concluded that a public school union's lobbying expenses with respect to employment-related legislation may properly be charged to nonunion employees. (See *Abels* v. *Monroe County Educ. Ass'n* (Ind.Ct.App. 1986) 489 N.E.2d 533, 540-542, cert. den. (1987) 480 U.S. 905 [94 L.Ed.2d 518, 107 S.Ct. 1347]; *Lehnert* v. *Ferris Faculty Association-MEA-NEA* (W.D. Mich. 1986) 643 F.Supp. 1306, 1323-1324 [interpreting Mich. statute]; *Matter of Board of Educ. of Town of Boonton* (1985) 99 N.J. 523 [494 A.2d 279, 290-292], cert. den. (1986) 475

U.S. 1072 [89 L.Ed.2d 613, 106 S.Ct. 1388]; see also *Robinson* v. *State of New Jersey* (3d Cir. 1984) 741 F.2d 598, 604-610, cert. den. (1985) 469 U.S. 1228 [84 L.Ed.2d 366, 105 S.Ct. 1228]; *Champion* v. *State of Cal.* (9th Cir. 1984) 738 F.2d 1082, 1086, cert. den. (1985) 469 U.S. 1229 [84 L.Ed.2d 367, 105 S.Ct. 1230].) Although one of the out-of-state decisions involved a statute that explicitly authorized an assessment for lobbying related to the collective bargaining process (see *Boonton, supra,* 494 A.2d at p. 282), a number of the decisions dealt with statutes—like EERA—that contained no specific provision directed at employment-related lobbying (see *Abels, supra,* 489 N.E.2d at pp. 541-542; *Lehnert, supra,* 643 F.Supp. at p. 1324) and nonetheless concluded that the assessment of such expenses was proper. In my view, there is nothing in the language or legislative history of EERA to suggest that the California Legislature intended to provide public school unions in this state with less protection from the free-rider problem than has been accorded to such unions under similar labor relations legislation in other states.

Accordingly, I respectfully dissent from the majority opinion to the extent it interprets EERA to preclude an exclusive representative from using service fees collected from nonunion members for lobbying activities on employment-related measures.

Broussard, J., concurred.