[No. C006009. Third Dist. Aug. 20, 1990.]

H. PAUL LILLEBO et al., Plaintiffs and Appellants, v.
GRAY DAVIS, as Controller, etc., et al., Defendants and
Respondents.

COUNSEL

Ronald A. Zumbruni, Anthony T. Caso and Sharon L. Browne for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, Richard M. Frank and Ramon M. de la Guardia, Deputy Attorneys General, Gary P. Reynolds, Howard Schwartz, Tuttle & Taylor and Frank E. Melton for Defendants and Respondents.

Diane Ross, Beverly Tucker, Ramon Romero and A. Eugene Huguenin as Amici Curiae on behalf of Defendants and Respondents.

OPINION

SPARKS, J.—

INTRODUCTION

The Ralph C. Dills Act[1] (Dills Act) (Gov. Code, § 3512 et seq.) has as one of its declared purposes the establishment of "a uniform basis for recognizing the right of state employees to join organizations of their own choosing and be represented by those organizations in their employment relations with the state. It is further the purpose of this chapter, in order to foster peaceful [labor] relations, . . . to permit the exclusive representative to receive financial support from those employees who receive the benefits of this representation." (§ 3512.) To this end, the Legislature has allowed these exclusive representatives[2] to include in their labor contracts a provision "for organizational security in the form of . . . [a] fair share fee deduction." (§ 3515.7, subd. (a).) A fair share fee deduction is defined as

---

[1] Under its former name, the SEERA (or State Employer-Employee Relations Act) constituted one-third of a euphonious trio of public employment relations acts along with the Educational Employment Relations Act, or EERA (Gov. Code, § 3540 et seq.), and the Higher Education Employment Relations Act, or HEERA (Gov. Code, § 3560 et seq.), but it has since been "tombstoned" in honor of its author. (Gov. Code, § 3524; see Zerger et al., Cal. Public Sector Labor Relations (1989) §§ 1.07[2]-[4].)

All further undesignated section references are to the Government Code.

[2] We recognize that in public sector labor relations, nomenclature tends toward terms of art. For simplicity of reference, however, we shall sometimes use the unadorned expression "union" to describe the recognized employee organization designated as the exclusive representative of a particular bargaining unit of public employees (see § 3513, subds. (a), (b)) and "labor contract" as a shorthand for the written memorandum of understanding reached between the Governor and the recognized employee organization following negotiations. (See § 3517.5.)

"the fee deducted by the state employer from the salary or wages of a state employee in an appropriate unit who does not become a member of and financially support the recognized employee organization." (§ 3513, subd. (j).) The purpose of the fee is to defray "the costs incurred by the recognized employee organization in fulfilling its duty to represent the [unit] employees in their employment relations with the state, . . ." (*Ibid.*) The Legislature, however, has also accorded these nonunion members of the represented unit the right "to demand and receive . . . a return of any part of that [fair share] fee paid . . . which represents the employee's additional pro rata share of expenditures by the [union] that is either in aid of activities or causes of a partisan political or ideological nature only incidentally related to the terms and conditions of employment, or applied towards the cost of any other benefits available only to members of the [union]." (§ 3515.8.) This refund, however, does not include costs related to certain types of lobbying. "The pro rata share subject to refund shall not reflect, however, the costs of support of lobbying activities designed to foster policy goals and collective negotiations and contract administration, or to secure for the employees represented advantages in wages, hours, and other conditions of employment in addition to those secured through meeting and conferring with the state employer." (*Ibid.*)

In this case, plaintiff H. Paul Lillebo and other public employees brought suit against the State Controller[3] and the California State Employees' Association (CSEA). The suit challenged the ability of the Legislature to allow recognized employee organizations, such as CSEA, to exact *any* fair share fee from those nonunion members of the represented unit who "desire" to exercise their statutory right "to represent themselves individually in their employment relations with the state." (§ 3515; see also § 3515.5.) Plaintiffs also raised facial constitutional challenges (1) to the mechanism set out in section 3515.8 by which objecting nonunion members of the represented unit may seek the return of that portion of their fair share fee permitted by section 3515.7 and (2) to the designation as nonrefundable in the remainder of section 3515.8 of the "costs of support of lobbying activities designed to foster policy goals and collective negotiations and contract administration, or to secure for the employees represented advantages in wages, hours, and other conditions of employment in addition to those secured through meeting and conferring with the state employer."

The trial court ruled that the challenged statutes were constitutional and did not violate plaintiffs' First Amendment rights. It therefore granted summary judgment in favor of defendants. Plaintiffs appealed and renewed

---

[3] This action originally named the former Controller, Kenneth Cory, as a defendant acting in his official capacity. We have substituted the present incumbent in his stead. (See 4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 290, pp. 344-345.)

their arguments here. Finding none of the plaintiffs' arguments to be tenable, we affirmed the judgment in our original opinion. Thereafter, the Supreme Court granted plaintiffs' petition for review and transferred the cause back to this court with directions to "vacate [our] opinion and . . . reconsider" it "in light of *Keller v. State Bar of California* (1990) 495 U.S. __ [110 L.Ed.2d 1, 110 S.Ct. 2228]." Although *Keller* in essence merely restates the general principles of the previous cases in the particular context of the California State Bar, we have emended our opinion as instructed (after giving the parties an opportunity for comment) and now reissue it.

To reiterate the original summary of our holding, we first hold that employees exercising the right of individual representation do not usurp the authority of the union to act as the authorized representative of the unit; thus, they may lawfully be compelled to support its efforts on their behalf. Second, section 3515.8 may be read in harmony with the governing constitutional standard for refunds of fair share fees, so there is no facial invalidity. Finally, the statutory authorization under section 3515.8 to lobby for policy goals, properly construed, is limited to activities germane to collective negotiations, contract administration and employment benefits. So construed, the nature of public sector employment makes lobbying the Legislature for better terms and conditions of public employment or other representation-related policy goals a cost properly chargeable against objecting nonmembers in the represented unit without factially offending the First Amendment. Consequently, we shall affirm the judgment in favor of defendants.

## BACKGROUND

Prior to its amendment in 1982, the SEERA authorized the state employer and recognized employee organizations, as part of a memorandum of understanding, to enter into agreements providing for organizational security in the form of "maintenance of membership" arrangements.[4] (Former § 3515; Stats. 1978, ch. 776, § 4.3.) The SEERA, however, did not provide for an organizational security arrangement whereby the public employee must either join the employee organization or pay the organization a service fee to defray its costs in representing the nonunion member.

In 1982, the Legislature for the first time authorized the state employer and recognized employee organizations to negotiate a fair share fee

---

[4] A maintenance of membership means, with an exception not relevant here, "that all employees who voluntarily are, or who voluntarily become, members of a recognized employee organization shall remain members of such employee organization in good standing for a period as agreed to by the parties pursuant to a memorandum of understanding." (§ 3513, subd. (h).)

arrangement as part of a memorandum of understanding by amending section 3515 to its current form. (Stats. 1982, ch. 1572.) Now, once an employee organization has been recognized as the exclusive representative of an appropriate unit, "it may enter into an agreement with the state employer providing for organizational security in the form of maintenance of membership or fair share fee deduction." (§ 3515.7, subd. (a).) As we noted at the outset, a fair share fee is a fee deducted automatically from the salary or wages of state employees in appropriate units who do not become a member of the recognized employee organization[5] (§ 3513, subd. (j)); the state employer is required to "furnish the recognized employee organization with sufficient employment data to allow the organization to calculate membership fees and the appropriate fair share fees, and shall deduct the amount specified by the recognized employee organization from the salary or wages of every employee for the membership fee or the fair share fee. These fees shall be remitted monthly to the recognized employee organization . . . . Fair share fee deductions shall continue for the duration of the agreement, or a period of three years from the effective date of the agreement, whichever comes first"[6] (§ 3515.7, subd. (b)); and the statutory scheme envisages a return of that part of the fair share fee used for partisan political or ideological purposes or for benefits available only to members of the union (§ 3515.8). These amendments became effective on January 1, 1983. (Cal. Const., art. IV, § 8, subd. (c)(1).)

In May 1983, more than 200 state employees filed a complaint against CSEA and the State Controller. CSEA is a recognized employee organization under the Dills Act. As such it negotiates employment contracts for numerous bargaining units and lobbies on behalf of them. The suit sought declaratory and injunctive relief and money damages. Following a number of procedural skirmishes, the plaintiffs received permission to file a second amended complaint in December 1986. This pleading, with a reduced plaintiffic presence of 99, had as its first cause of action a claim that section 3515.8 is unconstitutional because it allows defendant CSEA (the union

---

[5] The phrase "state employee" is defined to mean "any civil service employee of the state, and the teaching staff of schools under the jurisdiction of the State Department of Education or the Superintendent of Public Instruction, except managerial employees, confidential employees," and certain other designated technical personnel. (§ 3513, subd. (c).)

[6] The 1982 amendment also provides for a conscientious objection provision under which an employee with a religious or conscientious objection to joining or financially supporting an employee organization may, instead of paying the union, contribute an equal amount to a tax exempt charity. "[A]ny employee who is a member of a religious body whose traditional tenets or teachings include objections to joining or financially supporting employee organizations shall not be required to financially support the recognized employee organization. That employee, in lieu of a membership fee or a fair share fee deduction, shall instruct the employer to deduct and pay sums equal to the fair share fee to a nonreligious, nonlabor organization, charitable fund approved by the State Board of Control for receipt of charitable contributions by payroll deductions." (§ 3515.7, subd. (c).)

currently or formerly representing the plaintiffs) to expend fair share fees on lobbying the Legislature in violation of the plaintiffs' rights under the First Amendment to the United States Constitution. For their second cause of action, numerous plaintiffs alleged they "desired to represent themselves individually in their employment relations with the state as is their right under [sections 3515 and 3515.5]," but were nevertheless required to pay the fair share fee, which violated their First Amendment rights. The third cause of action challenged the constitutionality of the "pure rebate procedure used by CSEA and mandated by Section 3515.8." Finally, the fourth cause of action challenged the propriety of defendant State Controller continuing to deduct the allegedly impermissible fair share fees from the wages of the plaintiffs.

In January 1988, the plaintiffs moved for summary judgment/summary adjudication of issues. Defendant CSEA filed a response and a cross-motion for summary judgment/summary adjudication of issues. Defendant State Controller filed a joinder in CSEA's pleadings, adding supplementary argument. The trial court filed an order in May 1988 granting the defendants' motions and denying those of the plaintiffs. Following a motion by CSEA for reconsideration of a portion of the order, the court issued its final order in June 1988. There it rejected the claim embedded in the first cause of action that the provisions of the Dills Act defining the types of lobbying expenditures chargeable as "fair share fees" to objecting nonmembers were unconstitutional on their face. "The Court concludes that requiring nonmembers to help finance the costs of lobbying by the exclusive employee representative is not *per se* unconstitutional under the standards set forth in *Ellis* v. *Railway Clerks* (1984) 466 U.S. 435 [80 L.Ed.2d 428, 104 S.Ct. 1883], and SEERA's authorization of the collection and expenditure of fair share fees from objectors for certain types of lobbying activities (*see* California Government Code Section 3515.8) can be interpreted and implemented in a constitutional manner." (Italics original.) By stipulation of the parties, defendants' motion as to the second cause of action was considered as a motion for judgment on the pleadings. The court then granted that motion without leave to amend for failure to state a valid cause of action. The court concluded that plaintiffs "have failed to establish any basis in Constitutional law or California law for the proposition that non-members who claim to represent themselves in their employment relationship with the State cannot be required to pay fair share fees." On the third and fourth causes of action relating to the deduction of the fair share fee by the Controller and the statutory rebate mechanism, the court similarly concluded that "the procedural provisions of California Government Code Section 3515.8 can be interpreted and applied in a constitutional manner. To arrive at the appropriate amount of the fee to be charged to objecting fee payers, including Plaintiffs, pursuant to Government Code Section 3515.7, the fee must be

reduced before collection to reflect any expenditures that clearly may not constitutionally be charged to such fee payers, including member-only benefits and partisan political activities. To this extent, portions of the first sentence of Section 3515.8 become meaningless, as the portion of the fee that objecting fee payers clearly may not be compelled to pay, even temporarily, is not subject to rebate." Finally, as to the plaintiffs' motion for summary judgment on the actual procedures developed by CSEA for the collection, retention, refund and reduction of fair share fees, the court denied it "as to these 'as applied' issues for failure to state them in their motion, memorandum of points and authorities, and statement of material facts with sufficient specificity for the court to be able to render a decision."

In October 1988, the plaintiffs dismissed their claims relating to the unconstitutionality of the collection and use of the fees "as applied." In December 1988, the parties stipulated to a judgment in accord with the June order and the October dismissal, after which the plaintiffs filed this timely appeal.[7] To the extent any other facts might be relevant to the contentions, they will be incorporated in the discussion.

DISCUSSION

I

*Governing Principles*

Before we reach the specific contentions in this case, it behooves us to recapitulate United States Supreme Court case law pertinent to our resolution of this appeal. We do this in order to avoid disjointed piecemeal citation of the various cases in this area and to make clear the extent to which they are based on constitutional interpretation, and thus binding on us, or merely upon statutory interpretation, which we may or may not find persuasive as applied to California's statutes.

The Abraham of this family of cases is *Railway Employes' Dept. v. Hanson* (1956) 351 U.S. 225 [100 L.Ed. 1112, 76 S.Ct. 714], in which the high court considered the facial constitutionality of an amendment to the Railway Labor Act, or RLA (45 U.S.C. § 151 et seq.). The RLA authorized employers and unions to include in their labor contracts a provision for a union shop (i.e., a requirement that all members of the bargaining unit become union members within 60 days of hire as a condition of continued employment). (351 U.S. at p. 231 & fn. 3 [100 L.Ed. at p. 1130].) The sole

---

[7]In addition to these parties, we have permitted amicus curiae briefing to be filed by the California Teachers' Association.

incident of membership authorized by the RLA was payment of periodic dues, initiation fees, and assessments. The high court found "that the requirement for financial support of the [union] by all who receive the benefits of its work . . . does *not violate either the First or Fifth Amendments.*" (*Id.* at p. 238 [100 L.Ed. at p. 1134].) But the court was careful to limit its holding. "If 'assessments' are in fact imposed for purposes *not germane to collective bargaining,* a different problem would be presented." (*Id.* at p. 235, fn. deleted & italics added [100 L.Ed. at p. 1132].) Thus, "if the exaction of dues, initiation fees, or assessments is used as a cover for forcing ideological conformity or other action in contravention of the First Amendment, this judgment will not prejudice the decision in that case." (*Id.* at p. 238 [100 L.Ed. at p. 1134].)

Such a case somewhat presented itself in *Machinists v. Street* (1961) 367 U.S. 740 [6 L.Ed.2d 1141, 81 S.Ct. 1784]. The *Street* court noted *Hanson* "decided only that [the RLA], in authorizing [union shops], did not on its face impinge upon protected rights of association." (*Id.* at pp. 746-747 [6 L.Ed.2d at p. 1148].) The record in *Street,* by contrast, "is adequate squarely to present the constitutional question reserved in *Hanson.*" (*Id.* at p. 749 [6 L.Ed.2d at p. 1150].) However, the court instead interpreted the RLA as denying "the authority to a union, over the employee's objection, to spend his money for political causes which he opposes," therefore rendering unnecessary any constitutional adjudication. (*Id.* at p. 750 [6 L.Ed.2d at p. 1150].) Specifically, the court stated, "[t]he conclusion to which this [legislative] history clearly points is that [the RLA] contemplated compulsory unionism to force employees to share the costs of negotiating and administering collective agreements, and the costs of the adjustment and settlement of disputes. One looks in vain for any suggestion that Congress also meant . . . to provide the unions with a means for forcing employees, over their objection, to support political causes which they oppose." (*Id.* at pp. 763-764 [6 L.Ed.2d at pp. 1158-1159].) This was the limit of the holding. "We express no view," the court cautioned, "as to other union expenditures objected to by an employee and not made to meet the costs of negotiation and administration of collective agreements, or the adjustment and settlement of grievances and disputes." (*Id.* at p. 769 [6 L.Ed.2d at p. 1161].)[8] On the question of remedies for the improper expenditure of exacted dues, the court suggested that both injunctive relief and restitution might be adequate. "One remedy would be an injunction against expenditure for political

---

[8] The court reiterated this distinction in *Railway Clerks v. Allen* (1963) 373 U.S. 113 [10 L.Ed.2d 235, 83 S.Ct. 1158], reversing and remanding a case for further proceedings in light of *Street,* without deciding which union expenditures were "political expenditures" and which were "germane to collective bargaining," stating "only the former, to the extent made from exacted funds of dissenters, are not authorized by [the RLA]." (*Id.* at p. 121 [10 L.Ed.2d at p. 241].)

causes opposed by each complaining employee of a sum, from those moneys to be spent by the union for political purposes, which is so much of the moneys exacted from him as is the proportion of the union's total expenditures made for such political activities to the union's total budget . . . . A second remedy would be restitution to each individual employee of that portion of his money which the union expended, despite his notification, for the political causes to which he had advised the union he was opposed." (*Id.* at pp. 774-775 [6 L.Ed.2d at p. 1164].)

*Abood* v. *Detroit Board of Education* (1977) 431 U.S. 209 [52 L.Ed.2d 261, 97 S.Ct. 1782] is the case most directly concerning us, so we shall dissect it at length. There the court returned to the basic question of the facial constitutionality of a variation of the union shop in the context of public employment and the constitutionality of uses of exacted dues. The case involved a Michigan statute "authorizing a system for union representation of local governmental employees" which included permission for the union and local government employer "to agree to an 'agency shop' arrangement, whereby every employee represented by a union—even though not a union member—must pay to the union, as a condition of employment, a service fee equal in amount to union dues." (*Id.* at p. 211 [52 L.Ed.2d at p. 269].) Reiterating its past holdings, the court stated: "To compel employees financially to support their [union] has an impact upon their First Amendment interests . . . . But the judgment clearly made in *Hanson* and *Street* is that such interference as exists is constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress." (*Id.* at p. 222 [52 L.Ed.2d at p. 276].) The court then found the Michigan Legislature had identified governmental interests similar to those underlying the RLA. (*Id.* at p. 224 [52 L.Ed.2d at p. 277].) It consequently held that "[t]he same important government interests recognized in the *Hanson* and *Street* cases presumptively support the impingement upon associational freedom created by the agency shop here at issue. Thus, insofar as the service charge is used to finance expenditures by the Union for the purposes of collective bargaining, contract administration, and grievance adjustment, those two decisions of this Court appear to require validation of the agency-shop agreement before us." (*Id.* at pp. 225-226 [52 L.Ed.2d at p. 278].) The court also rejected arguments that public employees have a weightier First Amendment interest than private employees in not being compelled to contribute to the costs of exclusive union representation. (*Id.* at p. 229 [52 L.Ed.2d at p. 280].)

Since the Michigan Supreme Court had interpreted the Michigan statute as authorizing the use of nonunion members' fees for purposes other than collective bargaining, the Supreme Court was forced to decide the *constitutional* limits on the use of exacted dues, a question avoided in *Street*.

*(Abood, supra,* 431 U.S. at pp. 232-233, 240 [52 L.Ed.2d at pp. 282-283, 287-288].) Noting it had in past held "that contributing to an organization for the purpose of spreading a political message is protected by the First Amendment" *(id.* at p. 234 [52 L.Ed.2d at p. 284]), the court reasoned that "[t]he fact that the appellants are compelled to make, rather than prohibited from making, contributions for political purposes works no less an infringement of their constitutional rights." *(Ibid.)* In sum, the Constitution does not restrict a union from *expending* funds on "causes not germane to its duties as collective-bargaining representative. Rather, the Constitution requires only that such expenditures be financed . . . by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of governmental employment." *(Id.* at pp. 235-236 [52 L.Ed.2d at pp. 284-285].)

Having identified this general constitutional barrier to the use of funds, the *Abood* court declined to apply it to the particular facts. "There will, of course, be difficult problems in drawing lines between collective-bargaining activities, for which contributions may be compelled, and ideological activities unrelated to collective bargaining, for which such compulsion is prohibited. The Court held in *Street,* as a matter of statutory construction, that a similar line must be drawn under the [RLA], but in the public sector the line may be somewhat hazier. The process of establishing a written collective-bargaining agreement prescribing the terms and conditions of public employment may require not merely concord at the bargaining table, but subsequent approval by other public authorities; related budgetary and appropriations decisions might be seen as an integral part of the bargaining process. We have no occasion in this case, however, to try to define such a dividing line." (431 U.S. at p. 236 [52 L.Ed.2d at p. 285].)

Finally, on the question of remedies, the court declared: "In determining what remedy will be appropriate if the [objectors] prove their allegations, the objective must be to devise a way of preventing compulsory subsidization of ideological activity by employees who object thereto without restricting the Union's ability to require every employee to contribute to the cost of collective-bargaining activities." (431 U.S. at p. 237 [52 L.Ed.2d at p. 285].) It then reviewed the two remedies suggested in *Street* and also noted that it had suggested in *Allen* "that it would be highly desirable for unions to adopt a 'voluntary plan by which dissenters would be afforded an internal union remedy.'" *(Id.* at p. 240 [52 L.Ed.2d at p. 287].) In view of the internal remedy newly adopted by the union, the court concluded that "it may be appropriate under Michigan law, even if not strictly required by any doctrine of exhaustion of remedies, to defer further judicial proceedings pending the voluntary utilization by the parties of that internal remedy as a possible means of settling the dispute." *(Id.* at p. 242 [52 L.Ed.2d at p.

289].) But in his concurring opinion, Justice Stevens cautioned that by joining the opinion "including its discussion of possible remedies, I do not imply—nor do I understand the Court to imply—that the remedies described in *Machinists* v. *Street* 367 US 740, and *Railway Clerks* v. *Allen*, 373 US 113, would necessarily be adequate in this case or in any case. More specifically, the Court's opinion does not foreclose the argument that the Union should not be permitted to exact a service fee from nonmembers without first establishing a procedure which will avoid the risk that their funds will be used, even temporarily, to finance ideological activities unrelated to collective bargaining. Any final decision on the appropriate remedy must await the full development of the facts at trial." (*Id*. at p. 244, fn. & parallel citations omitted [52 L.Ed.2d at p. 290].)

In *Ellis* v. *Railway Clerks* (1984) 466 U.S. 435 [80 L.Ed.2d 428, 104 S.Ct. 1883] (on which the trial court relied), the high court, once again in the context of the RLA, at last adjudicated the statutory and constitutional propriety of a number of actual union expenditures, as well as the mechanism by which the dissenters could prevent their funds from being used. (*Id*. at p. 440 [80 L.Ed.2d at pp. 436-437].) Beginning with the rebate scheme the union used to refund the fees for activities to which dissenters objected, the court held "the pure rebate approach is inadequate." (*Id*. at p. 443 [80 L.Ed.2d at p. 439].) The court stated that for a union to use and then refund the money of an objector in effect charges the objector for the unauthorized activities; the refund, even if with interest, merely minimizes the degree of the violation because it still amounts to an involuntary loan. "Given the existence of acceptable alternatives [such as advance reduction of dues and/or interest bearing escrow accounts], the union cannot be allowed to commit dissenters' funds to improper uses even temporarily." (*Id*. at p. 444 [80 L.Ed.2d at p. 439].)

Turning to the various expenditures, the court noted at the outset that to the extent it could resolve the matter as a question of what expenditures were authorized by Congress in enacting the RLA, it would not need to reach the constitutional question. (466 U.S. at pp. 444-445 [80 L.Ed.2d at pp. 439-440].) While the RLA has no explicit limitation on the uses of the exacted dues (*id*. at p. 445 [80 L.Ed.2d at p. 440]), the court had previously recognized the implicit restriction against political or ideological uses and the implicit purpose of the statute: "the desire to eliminate free riders— employees in the bargaining unit on whose behalf the union was obliged to perform its statutory functions, but who refused to contribute to the cost thereof." (*Id*. at pp. 446-448 [80 L.Ed.2d at pp. 440-442].) In light of that implicit purpose, "the test must be whether the challenged expenditures are necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer

on labor-management issues." This includes not only the direct costs of "negotiating and administering a collective-bargaining contract and of settling grievances and disputes" but also the expenses for activities which "implement or effectuate the duties of the union as exclusive representative of the employees in the bargaining unit." (*Id*. at p. 448 [80 L.Ed.2d at p. 442].) Armed with this statutory interpretation, the court then considered the various challenged costs. Conventions are essential to maintaining a union's corporate or associational existence and assist in formulating bargaining goals (*id*. at pp. 448-449 [80 L.Ed.2d at pp. 442-443]); social activities are de minimis and help create harmonious working relationships among unit members (*id*. at pp. 449-450 [80 L.Ed.2d at pp. 442-443]); and communications with unit members—to the extent they are nonideological and not political—are essential to keep them informed and educated (*id*. at pp. 450-451 [80 L.Ed.2d at pp. 442-443]), so all these costs are within the scope of the RLA. General organizing activities are not, because they are not spent on unit members and do not implicate the "free rider" problem (*id*. at pp. 451-452 [80 L.Ed.2d at pp. 443-444]), and litigation expenses, to the extent they do not directly concern unit members or are not normally conducted by the union, do not have a sufficient connection with the unit to be charged to nonunion members (*id*. at p. 453 [80 L.Ed.2d at p. 445]).[9] At last reaching the constitutionality of the three authorized categories of costs, the court declared, somewhat anticlimactically, that there was no additional infringement upon a dissenter's First Amendment rights in supporting these activities beyond the initial infringement on the right not to associate; these categories of activities simply flowed from the initial requirement the dissenter be part of a unit for collective bargaining purposes since they related to the union's work in that respect. Consequently, there was no First Amendment bar to such use. (*Id*. at pp. 455-457 [80 L.Ed.2d at pp. 446-448].)

In *Teachers* v. *Hudson* (1986) 475 U.S. 292 [89 L.Ed.2d 232, 106 S.Ct. 1066], the court returned to the question of enforcing the rights of dissenters. "[T]his case concerns the constitutionality of the procedure adopted by the . . . Union, with the approval of the [employer], to draw that necessary line [between union expenditures that all employees must help defray and those that are not sufficiently related to collective bargaining to justify their being imposed on dissenters] and to respond to nonmembers' objections to the manner in which it was drawn." (*Id*. at p. 294 [89 L.Ed.2d at p. 239].) The procedure set up by the union in this case did not provide for advance objection to the fee deduction, although the union itself determined an amount of costs which could not be recovered from nonmembers and re-

---

[9] The court did not express any view as to death benefits, declaring that question moot. (*Id*. at pp. 453-454 [80 L.Ed.2d at pp. 445-446].)

duced the fee for them proportionately. No information regarding the manner in which this determination was made was provided in advance to unit members. The protest mechanism to recover fees paid had three steps, the third of which was arbitration (with the arbitrator selected and paid by union). If the objection was sustained, there was an immediate reduction in the future and a rebate of past fees paid. (*Id.* at p. 296 [89 L.Ed.2d at pp. 240-241].) As the court framed it, the case presented two issues alone—was this procedure permissible, and did the union's subsequent adoption of an escrow system cure any flaws. (*Id.* at p. 304 [89 L.Ed.2d at pp. 245-246].) The court expressly declined to do any line-drawing regarding the types of permissible costs. (*Id.* at p. 304, fn. 13 [89 L.Ed.2d at pp. 245-246].)

With respect to the first issue, the *Hudson* court identified three flaws in the original procedure: first, the rebate procedure had been previously condemned in the concurring opinion of Justice Stevens in *Abood*; second, the union's self-imposed "advance reduction of dues" procedure was flawed, because no information was provided to unit members with respect to the manner of segregating costs; and third, there was no reasonably prompt adjudication by an impartial decisionmaker on the propriety of the union's line-drawing—the three-step process was too slow and the arbitrator was selected by the union. (475 U.S. at pp. 305-308 [89 L.Ed.2d at pp. 246-248].) Thus, the dissenters' First Amendment rights were violated. (*Id.* at pp. 304, fn. 13, 309 [89 L.Ed.2d at pp. 245, 248-249].) As for the second issue, the union's subsequent adoption of an escrow procedure still left the two flaws of inadequate information with respect to the basis of the union line-drawing and the lack of prompt impartial decisionmaking. Nevertheless, the escrow "eliminates the risk that nonunion employees' contributions may be temporarily used for impermissible purposes," the flaw identified by *Abood* in pure rebate schemes. (*Id.* at p. 309 [89 L.Ed.2d at pp. 248-249].) In connection with the escrow, the court advised that "[i]f the Union chooses to escrow less than the entire amount, however, it must carefully justify the limited escrow on the basis of [an] independent audit, and the escrow figure must itself be independently verified." (*Id.* at p. 310, fn. 23 [89 L.Ed.2d at p. 249].) In summary, the *Hudson* court held that "the constitutional requirements for the Union's collection of agency fees include an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending." (*Id.* at p. 310 [89 L.Ed.2d at p. 249].)

*Communications Workers* v. *Beck* (1988) 487 U.S. 735 [101 L.Ed.2d 634, 108 S.Ct. 2641] is the penultimate case in this lengthy recapitulation. As the court framed the issue in that case, "Today we must decide whether this provision [in the National Labor Relations Act (NLRA) permitting unions

to charge nonmembers dues as a condition of employment] also permits a union, over the objections of dues-paying nonmember employees, to expend funds so collected on activities unrelated to collective bargaining, contract administration, or grievance adjustment, and, if so, whether such expenditures violate the union's duty of fair representation or the objecting employees' First Amendment rights." (*Id.* at p. 738 [101 L.Ed.2d at p. 642].) Finding the provision in the NLRA identical in all material respects to its counterpart in the RLA, the court had no trouble interpreting the statute as including the same limitations on uses of fees addressed in *Ellis*: "[O]nly those fees and dues necessary to 'performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues'" can be exacted of unit members. (*Id.* at pp. 662-663 [101 L.Ed.2d at p. 657].)

Finally, the Supreme Court's most recent pronouncement on this issue was in *Keller,* a case which passed through this court in the course of its lengthy judicial life. In the précis of the Chief Justice, "Petitioners, members of the State Bar of California, sued that body claiming its use of their membership dues to finance certain ideological or political activities to which they were opposed violated their rights under the First Amendment of the United States Constitution. The Supreme Court of California rejected this challenge on the grounds that respondent State Bar is a state agency, and as such may use the dues for any purpose within its broad statutory authority. We agree that lawyers admitted to practice in the State may be required to join and pay dues to the State Bar, but disagree as to the scope of permissible dues-financed activities in which respondent may engage." (495 U.S. at p. __ [110 L.Ed.2d at p. 8].)

On the first issue, the high court held that the vote of six justices in its decision in *Lathrop* v. *Donohue* (1961) 367 U.S. 820 [6 L.Ed.2d 1191, 81 S.Ct. 1826]—a half-sibling of *Street, supra,* 367 U.S. 740, previously without issue—foreclosed the question of compulsory membership and financial support. (*Keller* (1990) 495 U.S. __ [110 L.Ed.2d 1, 110 S.Ct. 2228] 495 U.S. at p. __ [110 L.Ed.2d at p. 10].) However, the question of the *uses* to which the dues could be put had been left open and was now squarely presented by the plaintiffs. (*Id.* at p. __ [110 L.Ed.2d at pp. 10-11].)

The high court first rejected the characterization of the State Bar as a "government agency" for purposes of First Amendment analysis. "The State Bar of California was created, not to participate in the general government of the State, but to provide specialized professional advice to those with the ultimate responsibility of governing the legal profession. Its members and officers are such not because they are citizens or voters, but because they are lawyers. We think that these differences between the State

Bar, on the one hand, and traditional government agencies and officials, on the other hand, render unavailing respondent's argument that it is not subject to the same constitutional rule with respect to the use of compulsory dues *as are labor unions representing public and private employees. (Keller, supra,* 495 U.S. at p. __ [110 L.Ed.2d at pp. 13-14], [italics supplied].) Relying on the standard from *Ellis* we quoted earlier, the court concluded: "We think these principles are useful guidelines for determining permissible expenditures in the present context as well. Thus, the guiding standard must be whether the challenged expenditures are necessarily or reasonably incurred for the purpose of regulating the legal profession or 'improving the quality of the legal services available to the people of the State.' "[10] (*Id.* at p. __ [110 L.Ed.2d at p. 14].)

The *Keller* court also reaffirmed the constitutionality of the *Hudson* procedures we have just recounted at length: "In [*Hudson*], where we outlined a minimum set of procedures by which a union in an agency shop relationship could meet its requirement under *Abood*, we had a developed record . . . . We do not have any similar record here. We believe an integrated bar could certainly meet its *Abood* obligation by adopting the sort of procedures described in *Hudson*." (495 U.S. at p. __ [110 L.Ed.2d at p. 16].)

With this historical and legal framework in mind, we turn now to the issues tendered in this appeal.

## II

*Costs for lobbying on matters germane to collective bargaining are proper charges.*

■ As set up by their complaint, the plaintiffs' first challenge focuses on the penultimate sentence of section 3515.8, which prevents any refund for "the costs of support of lobbying activities designed to foster policy goals *and* collective negotiations and contract administration, or to secure for the employees represented advantages in wages, hours, and other conditions of employment in addition to those secured through meeting and conferring with the state employer." (Italics added.) Their claim in this

[10] The high court seemed to consider this standard to be more constricted than the formulation upon which the California Supreme Court relied, that of the authorizing statute. (See Bus. & Prof. *Code,* § 6031, subd. (a) ["*all matters pertaining to the advancement of the science of jurisprudence or to the improvement of the administration of justice*"].) "Simply putting this language [of the statute] alongside our previous discussion of the extent to which the activities of the State Bar may be financed from compulsory dues might suggest that there is little difference between the two. But there is a difference . . . ." (*Id.* at p. __ [110 L.Ed.2d at p. 15].)

respect is that section 3515.8, on its face, permits the collection and expenditure of fair share fees for lobbying activity which does not further the collective bargaining process. As plaintiffs read it, section 3515.8 allows the use of compelled fees to underwrite the costs of lobbying for policy goals which have nothing to do with collective bargaining. CSEA argues in rebuttal that the word "and" following the phrase "policy goals" was a legislative "typographical error" and should have been "in"; properly read, this section authorizes the use of fair shares fees for only "the costs of support of lobbying activities designed to foster policy goals [*in*] collective negotiations and contract administration, or to secure for the employees represented advantages in wages, hours, and other conditions of employment in addition to those secured through meeting and conferring with the state employer." Given the context of this statute and its legislative history, we are compelled to agree.

First, section 3515.8 expressly prohibits the expenditure of fair share fees by the union "in aid of activities or causes of a partisan political and ideological nature only incidentally related to the terms and conditions of employment or applied towards the costs of any other benefits available only to members of the recognized employee organization." Having explicitly barred those expenditures, it would be bizarre to construe the statute as permitting them in the guise of support for unrestricted lobbying; if the amorphous "policy goals" were themselves a permissible lobbying activity which could be levied against nonmembers with no restriction on the type of policy goal, it would be an absurd contradiction of the immediately preceding sentence declaring "partisan political or ideological" activities or member-only benefits to be nonchargeable against objecting nonmembers.

Second, nothing in the legislative history of the section even remotely suggests a legislative intent to authorize expenditures of compelled fees for partisan or membership purposes only when lobbying. █ It has been repeatedly held that courts should disregard the literal language of a statute when it would result in absurd consequences or frustrate the manifest purposes of the legislation as a whole. (See, e.g., *People* v. *Boyd* (1979) 24 Cal.3d 285, 294 [155 Cal.Rptr. 367, 594 P.2d 484].) "The literal meaning of the words of a statute may be disregarded to avoid absurd results or to give effect to manifest purposes that, in the light of the statute's legislative history, appear from its provisions considered as a whole." (*Silver* v. *Brown* (1966) 63 Cal.2d 841, 845 [48 Cal.Rptr. 609, 409 P.2d 689].) Plaintiffs' literal reading of the statute "ignores the principle that [t]he mere literal construction of a section in a statute ought not to prevail if it is opposed to the intention of the legislature apparent by the statute . . . ." (*Webster* v. *Superior Court* (1988) 46 Cal.3d 338, 344 [250 Cal.Rptr. 268, 758 P.2d 596], citation & internal quotation marks omitted.) As the California Supreme

Court explained in the context of the mistaken use of "and" for "or," the courts in construing a statute should not undertake to rewrite its unambiguous language. "That rule is not applied, however, when it appears clear that a word has been erroneously used, and a judicial correction will best carry out the intent of the adopting body. The inadvertent use of 'and' where the purpose or intent of the statute seems clearly to require ['in'] is a familiar example of a drafting error which may properly be rectified by judicial construction." (*People* v. *Skinner* (1985) 39 Cal.3d 765, 775 [217 Cal.Rptr. 685, 704 P.2d 752], citations omitted.)

■ Finally, the literal reading urged by the plaintiffs would inevitably cause the statute to be facially unconstitutional. ■ In this area, as in others, the highest court in the land has consistently stated that "[w]hen the constitutionality of a statute is challenged, this Court first ascertains whether the statute can be reasonably construed to avoid the constitutional difficulty." (*Ellis, supra,* 466 U.S. at p. 444, citations omitted [80 L.Ed.2d at p. 439].) California courts have themselves long adopted an identical rule of statutory construction. Courts must "adopt an interpretation that, consistent with the statutory language and purpose, eliminates doubts as to the provision's constitutionality." (*In re Kay* (1970) 1 Cal.3d 930, 942 [83 Cal.Rptr. 686, 464 P.2d 142], cited with approval in *People* v. *Davis* (1981) 29 Cal.3d 814, 829 [176 Cal.Rptr. 521, 633 P.2d 186].) ■ We therefore rectify the mistaken use of the word "and" by construing it as "in." So construed, the statute permits the use of compelled fees for lobbying to further goals in collective negotiations and contract administration and to secure employment benefits.

Plaintiffs' remaining challenges to the statutory authorization for such lobbying expenditures are particularly vague. This is understandable, since they appear to concede that the Supreme Court precedent we have discussed permits recompense for lobbying which fosters the goals of negotiations and administration of the labor contract. ■ This leaves them only the assertion they do not explicitly voice that they have ideological objections to lobbying activities by the union which obtain advantages for them in their conditions of employment.[11] They claim they cannot be compelled to support such lobbying of the Legislature because this is not dealing with the employer, as the high court has phrased it in some of the above deci-

[11] Although plaintiffs protest against CSEA lobbying in favor of legislation they deem odious, this ignores the fact that sections 3515.7 and 3515.8, properly construed, do prevent the plaintiffs' share of fees from being applied to "activities or causes of a partisan political or ideological nature." This also ignores the fact that whether CSEA is indeed engaging in such lobbying and whether CSEA improperly refuses to refund fees so expended are questions going to the constitutionality of the statute as applied, which is not before us by virtue of their dismissal of this aspect of their action.

sions, since the Dills Act defines the "state employer" as the Governor or designated representative of the Governor. (§ 3513, subd. (i).) They also suggest this lobbying is not germane to collective bargaining, again using the terminology of the high court decisions, and it cannot be assessed against them because any resulting legislation benefits state employees generally rather than members of their particular units, relying on the previously discussed analysis of litigation expenses in *Ellis*.

To begin with, their restrictive view of the "employer" with whom the CSEA may constitutionally interact when supported by exacted fees has no basis in the United States Supreme Court decisions and has been undermined by the decision of the California Supreme Court in *Cumero* v. *Public Employment Relations Bd.* (1989) 49 Cal.3d 575 [262 Cal.Rptr. 46, 778 P.2d 174]. Almost all the federal cases we have recounted involve *private sector* employment, where the identity of the employer with whom a union performs its duties is self-evident. *Abood*, on the other hand, which is the sole case considering a union's authorized role in the public sector, notes without deciding that there can be a much broader *group* of decision makers in the management role with whom the representative of government workers must interact. (431 U.S. at p. 236 [52 L.Ed.2d at p. 285].) We thus perceive no constitutional roadblock to including the Legislature within the concept of employer of public employees.

Nor does the scheme of the Dills Act preclude this employer role for the Legislature. First of all, the state employer is defined as the Governor or his designated representatives only "for the purposes of bargaining or meeting and conferring in good faith." (§ 3513, subd. (i).) Nothing in the Dills Act suggests that the Governor is the state employer for all purposes, including lobbying. Indeed, in the context of public employment negotiations, the employer/state often assumes a duality in its executive and legislative roles. As the California Supreme Court noted in *Cumero*, the "word 'state' is not expressly defined in the [Dills Act]. For the limited purpose of the duty to meet and confer in good faith with recognized employee organizations on matters within the scope of representation, the 'state employer' is defined as the Governor or his designated representative. (§§ 3513, subd. (i), 3517.) Thus, in enacting the 1982 amendment allowing unions to use nonmember state employee service fees to lobby for conditions of employment 'in addition to those secured through meeting and conferring with the state employer' (§ 3515.8), the Legislature may well have had in mind the distinction, embedded in the [Dills Act] since 1977, between a union's specific right and duty to meet and confer with the Governor or the Governor's representative (see §§ 3513, subd. (i), 3517, 3519, subd. (c)) and the union's broader right to represent its members in employment relations with the *state* (see

§§ 3512, 3515.5), including not only the executive branch but also the Legislature." (49 Cal.3d at p. 597, italics original.)

This quibble over semantics aside, it should be apparent from our summary of high court cases from *Hanson* through *Keller* that regardless of the particular way the high court may have phrased it in a given case, the test for dividing the mandatory support between chargeable and nonchargeable expenses can be boiled down to this: when the union is acting qua union, expenses can be exacted; when it is merely an organization taking actions having no connection with the representation of the bargaining unit on employment-related matter, expenses may *not* be exacted. We cannot fathom how a union's lobbying the Legislature for improvement of the conditions of employment of the members of its bargaining unit—union and nonunion alike—could not be considered to be part of its role as representative,[12] or why a nonunion unit member benefiting from that representation should not be expected to contribute toward the cost of achieving it. This squarely implicates the essential state interest in eliminating the "free rider" problem (in order to facilitate labor peace) which justifies what might otherwise infringe upon the nonmember's constitutional rights.[13]

Despite plaintiffs' contrary contention, nothing in the recent decision in *Keller* changes this analysis. As plaintiffs read it, *Keller* prohibits the use of agency fees for lobbying activities unrelated to securing legislative approval of a collective bargaining agreement. Any additional lobbying activities, they urge, are not germane to the purpose for which compelled association was justified. Thus, so their argument goes, nonmember employees may be charged for lobbying activities only to obtain approval of the memorandum of understanding or related budgetary issues.

In our view, *Keller* does not even purport to alter the general guidelines for the permissible use of compelled contributions. Consequently, it cannot

---

[12] This is especially so because the Legislature has said the fair share fee represents reimbursement for union activity "in fulfilling its *duty* to represent the employees in their employment relations with the state." (§ 3513, subd. (j), [italics added].) This is the same phraseology the *Cumero* court noted as embracing legislative lobbying (49 Cal.3d at p. 597), and the scope of representation by the union generally extends to "wages, hours, and other terms and conditions of employment" under section 3516.

[13] The California Supreme Court came to the same conclusion in *Cumero* in construing the EERA. By virtue of a distinction between the EERA and the Dills Act not relevant here, the court did not find legislative authorization for independent lobbying efforts by unions on matters affecting conditions of employment, holding instead unions could do so only when asked by the employing public agency. (49 Cal.3d at pp. 591-594.) However, when so asked, the union could charge all such expenses to objecting nonmembers without violating their rights, because under *Abood* and *Ellis* such lobbying is sufficiently related to their role as representative of a public sector unit. (*Id*. at pp. 594-595; accord *Lehnert* v. *Ferris Faculty Ass'n* (6th Cir. 1989) 881 F.2d 1388, 1392-1393.)

be read to suggest, as plaintiffs would have it, that lobbying reasonably related to the advancement of the union's representational role may not be charged to objecting nonmembers or that all lobbying must be confined to seeking approval of the memorandum of understanding or related budgetary items.

Moreover, the succor the plaintiffs would seek in the discussion in *Ellis* about litigation expenses—in particular, the disallowance of reimbursement for litigation which generally benefits employees beyond the bargaining unit (466 U.S. at p. 453 [80 L.Ed.2d at p. 445])—is illusive. First of all, the discussion (as we have noted) was in the context of determining legislative intent on the part of Congress as to the nature of the uses to which exacted fees could be put. Here, we have express legislative authorization for such use. Moreover, to the extent the discussion of litigation expenses might have been constitutionally inspired, it is nevertheless inapposite. There is a real distinction between litigation and legislation: in the former, the union can itself select the scope of employees for whom it wishes to seek redress, while in the latter, "[i]t is unrealistic to expect a union, when lobbying a state legislature for funds . . . , to lobby for monies to support each specific [bargaining unit] separately" (*Lehnert, supra,* 881 F.2d at p. 1393); any legislature which did countenance such specifically-targeted lobbying would find itself deluged with public employee requests. For all of these reasons, we conclude that the union may properly use fair share fees for lobbying on matters germane to its collective bargaining role.

### III

*Plaintiffs desiring to represent themselves individually may be assessed a fair share fee.*

In the great American tradition of individualism, a number of the plaintiffs (as we have noted) alleged their desire, pursuant to sections 3515 and 3515.5, to go one-on-one with the power and majesty of the state in handling their own employment relations *without* the unwanted aegis of the union. They claim as a result they cannot constitutionally be assessed fair share fees because CSEA would be providing them with no services in return.

There is a problem at the outset with this argument: there is no allegation they ever represented or even attempted to represent themselves. Putting this glitch aside, we agree there is a surface attractiveness to this contention by the plaintiffs. The cited Supreme Court cases identify the compelling interest in labor peace as the justification for mandatory support of the efforts of a single union on behalf of a unit of employees. It would seem to

follow, therefore, that if the union actually performs no services on behalf of the nonmembers the justification is absent and thus the infringement of the right to refrain from association cannot be permitted. However, this argument collapses on itself when its keystone is removed—whatever the parameters of their right of self-representation, state employees have no mechanism for enforcement of this statutory right, which requires them by default to accept the benefits of exclusive representation.

We first dispatch the sole authority provided by the plaintiffs in support of their belief that an individual nonunion member of a represented unit may nevertheless effectively act independently of the union in employment relations with the state, so that the benefits they obtain derive from their own efforts, not from union representation. *Placentia Fire Fighters* v. *City of Placentia* (1976) 57 Cal.App.3d 9 [129 Cal.Rptr. 126] is a case involving the Meyers-Milias-Brown Act (MMB Act) (§ 3500 et seq.),[14] which governs labor relations for employees of all municipalities and local governmental subdivisions of the state except for public school districts (Zerger et al., *supra*, Cal. Public Sector Labor Relations, § 2.14[2], at p. 2-12). This opinion talks of many things not necessary to its resolution. Lurking in the midst of ships and shoes and sealing wax is the fact the city wished to exclude two fire captains from the unit as supervisory personnel. (*Placentia Fire Fighters, supra,* 57 Cal.App. 3d at p. 16.) The city later unilaterally gave these two captains a raise. (*Id.* at p. 17.) The court then noted (in the language on which the plaintiffs would rely): "Several things are apparent from the Act: . . . [¶] There is to be only one employee representative of a unit; but a member of that unit is not required to join the representative group and may bargain directly with the public agency." (*Id.* at p. 21.) This is the extent of the analysis, and it is dictum at that. As the court itself framed it, the issue in the case was the failure of the city to meet and confer with the union in good faith (with the pay raise to the captains being evidence of bad faith), subsidiary issues being whether the classification violated the requirement of an appropriate unit or the pay raise constituted unlawful discrimination against the union. (*Id.* at p. 20.)[15] Ultimately the court held the classification was *not* evidence of bad faith (*id.* at pp. 23-24), was an appropriate parsing of supervisors from the unit under NLRA precedent (*id.* at p. 24), and no unlawful discrimination existed because the captains "were not then members of the Union, *were not within the bargaining unit as then established,* [and] were free under the Act to deal directly with City, . . ." (*Id.* at p. 25, italics added.) Since the men were *not* mem-

---

[14] Since we ultimately do not find *Placentia Fire Fighters* to be apposite, we have no cause to examine whether the provisions of the MMB Act sufficiently parallel those of the Dills Act to render decisions under the former analogous to the latter.

[15] Having no desire and no need to get into the substance of these various terms of art, we are content to identify these issues without further explanation.

bers of the bargaining unit, any discussion of their rights to deal with the employer fully independent of any representative of the unit is utter dictum.[16]

With no conclusive judicial authority, we look to the language of pertinent provisions of the Dills Act itself. The organizational rights of employees enumerated by the legislation include the right to form, join, and participate in unions for purposes of representation on all matters of employer-employee relations; the right to refrain from such forming, joining, and participating, "except that *nothing* shall preclude the parties from agreeing to a . . . fair share fee provision . . . ." (italics added); and a limitation that, "[i]n any event, state employees shall have the right to represent themselves individually in their employment relations with the state." (§ 3515.) The Dills Act also provides "once a [union] is recognized as the exclusive representative of an appropriate unit, the recognized [union] is the only organization that may represent *that unit* in employment relations with the state . . . ." (Italics added.) This, too, is followed by a limitation: "Nothing in this section shall prohibit any employee from *appearing* in his own behalf in his employment relations with the state." (§ 3515.5, italics added.) But what is the extent of these declared rights?

The declared purposes of the Dills Act do not aid us in supplying meaning to the individualistic portions of these Janus-like statutes, as section 3512 is entirely focused on the establishment of relations between the state employer and union, of a means for selection of unions and a means for certifying the unions as exclusive representatives of their units, and of a means for providing financial support for the unions. Not a word regarding individual representation rights appears. Nor does the Dills Act otherwise provide any affirmative delineation of these rights to "represent" or "appear" in one's own behalf.

In point of fact, the Dills Act makes quite clear what an individual employee *cannot* do effectively when part of an appropriate unit certified by the Public Employment Relations Board (PERB) (§ 3521) with an exclusive representative selected by a majority of the employees in that unit (§§ 3513, subds. (a) & (b), 3520.5). First, the duty imposed on the Governor to meet and confer regarding terms and conditions of employment is specifically

---

[16] The issue of the limits of the right to self-representation under the MMB Act was also raised in *Andrews* v. *Board of Supervisors* (1982) 134 Cal.App.3d 274 [184 Cal.Rptr. 542], with a nonunion member of the represented unit claiming that he was not bound by the labor agreement between the public entity employer and the union and that the employer wrongfully refused to recognize his right of self-representation on questions of conditions of employment. (*Id*. at p. 280.) However, without interpreting the reach of the statute, the court resolved the matter by reference to county ordinances (*id*. at pp. 280-281), which are explicitly allowed to supersede the MMB Act. (§ 3500.)

limited to the exclusive representative. (§ 3517.)[17] Second, there is no statutory right to present grievances regarding terms and conditions of employment as determined by the meet-and-confer process;[18] thus, individual employees at best have the right to a grievance procedure (in which the employer is bound to respond) only to the extent it is created by the contract negotiated and administered by the union.[19] Hence, in these two primary areas, the employee might attempt to act independently, but nothing requires anyone to pay any attention. And since, as a member of the unit, all the benefits of representation nevertheless accrue to the unassociated employee, the employee becomes the free rider for whom the United States Supreme Court has said the First Amendment may be infringed to avoid. Moreover, as we have noted elsewhere, the fair share fee may be used only "to defray the costs incurred by the recognized employee organization in fulfilling its duty to represent the employees in their employment relations with the state, . . ." (§ 3513, subd. (j).) Thus, the union is mandated to use the compelled fees of nonmembers for representational purposes alone. Consequently, even those members of the unit who are not union members and who do not desire the benefits of union representation are nevertheless beneficiaries and may properly be assessed fair share fees.

IV

*Section 3515.8 is not facially unconstitutional on the other grounds asserted by plaintiffs.*

A.

The plaintiffs next contend that it exceeds the bounds of judicial discretion to choose, as the trial court did, "to rewrite" section 3515.8 in order to avoid finding the plain meaning of the demand and return provisions un-

---

[17] The plaintiffs make the unavailing argument that nothing in section 3517 *prevents* the Governor from meeting and conferring with individual employees. To accept this line of reasoning would render section 3517 meaningless, because before the enactment of section 3517 there was nothing to prevent the Governor from meeting and conferring with unions, either. As the Supreme Court noted in *Pacific Legal Foundation* v. *Brown* (1981) 29 Cal.3d 168 [172 Cal.Rptr. 487, 624 P.2d 1215], before the statutory creation in 1961 of a duty on the state to meet and confer with state employees under a precursor of the Dills Act, "public employees in California enjoyed no formal rights to participate in the decision-making processes which determined the terms and conditions of their employment." (*Id.* at pp. 175-176.) We therefore reject the argument.

[18] We are not concerned with the extent to which state civil service employees have rights independent of the contract governing their unit.

[19] It is possible section 3515.5 would entitle employees to appear in their own behalf at whatever proceeding is authorized by the contract, including any arbitration invoked by the union or employer, but that is not an area we need explore because, even if so, the employees are nevertheless benefiting from the procedure exacted by the union from the employer.

constitutional. As they see it, the rebate scheme authorized in section 3515.8 is the type of procedure found unconstitutional in *Ellis* and *Hudson*. They claim the section is unconstitutional on its face because it allows the union to collect a compelled fee and months later rebate to the objecting employee that amount which it was clearly unauthorized to collect in the first place.

The plaintiffs shoulder a heavy burden in asserting the facial unconstitutionality of a statute. ■ "To support a determination of facial unconstitutionality, voiding the statute as a whole, petitioners cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular application of the statute, . . . Rather, petitioners must demonstrate that the act's provisions *inevitably* pose a present total and fatal conflict with applicable constitutional prohibitions." (*Pacific Legal Foundation, supra,* 29 Cal.3d at pp. 180-181, italics added and omitted; accord *California State Employees' Assn.* v. *State of California* (1988) 199 Cal.App.3d 840, 846 [245 Cal.Rptr. 232].) Moreover, where it is obvious, as it is here, that the statute in question was enacted with constitutional prescriptions in mind, this represents a considered legislative judgment which is entitled to significant weight and deference (*Pacific Legal Foundation, supra,* 29 Cal.3d at p. 180), requiring we resolve all doubts in favor of the legislative action. (*California State Employees' Assn., supra,* 199 Cal.App.3d at p. 846.)

B.

■ With respect to the adequacy of the refund mechanism, the plaintiffs seize upon the opening phrase in section 3515.8—"Any state employee who pays a fair share fee shall have the right *to demand and receive . . . a return* of any part of that fee . . . ."[20] (Italics added.) They then assert that the statute mandates a rebate mechanism, which has been condemned in both *Ellis* and *Hudson*. The plaintiffs insist the statute can be interpreted no

---

[20]To reiterate, section 3515.8 reads in its entirety: "Any state employee who pays a fair share fee shall have the right to demand and receive from the recognized employee organization, under procedures established by the recognized employee organization, a return of any part of that fee paid by him or her which represents the employee's additional pro rata share of expenditures by the recognized employee organization that is either in aid of activities or causes of a partisan political or ideological nature only incidentally related to the terms and conditions of employment, or applied towards the cost of any other benefits available only to members of the recognized employee organization. The pro rata share subject to refund shall not reflect, however, the costs of support of lobbying activities designed to foster policy goals and collective negotiations and contract administration, or to secure for the employees represented advantages in wages, hours, and other conditions of employment in addition to those secured through meeting and conferring with the state employer. The board may compel the recognized employee organization to return that portion of a fair share fee which the board may determine to be subject to refund under the provisions of this section."

other way without engaging in judicial legislation. (*Metromedia, Inc.* v. *City of San Diego* (1982) 32 Cal.3d 180, 187 [185 Cal.Rptr. 260, 649 P.2d 902].) Such is hardly the case.

As plaintiffs read it, this section allows state employees under the Dills Act the right to a refund of misspent fees rather than a reduction in the fee. Plaintiffs' argument erroneously presupposes that a fair share fee is equal to the full dues assessed against members of the union. On that erroneous assumption, plaintiffs classify the statutory procedure as a pure rebate system of the type struck down in *Ellis*. "By exacting and using full dues, then refunding months later the portion that it was not allowed to exact in the first place, the union effectively charges the employees for activities that are outside the scope of the statutory portion authorization." (*Ellis, supra,* 466 U.S. at p. 444 [80 L.Ed.2d at p. 439].) Thus, the union improperly "obtains an involuntary loan for purposes to which the employee objects." (*Ibid.*) To overcome this constitutional hurdle, the trial court ruled that "the fee must be reduced before collection to reflect any expenditures that clearly may not constitutionally be charged to such fee payers, including members-only benefits and partisan political activities. To this extent, portions of the first sentence of Section 3515.8 become[] meaningless, as the portion of the fee that objecting fee payers clearly may not be compelled to pay, even temporarily, is not subject to rebate." In plaintiffs' view, the trial court has abused its discretion by building an impossibly convoluted and unworkable structure upon a foundation of sand.

Both the trial court and the plaintiffs overlook the fact that, by definition, a fair share fee is already a reduced fee. It may be calculated only in such amount as may "defray the costs incurred by the recognized employee organization in fulfilling its duty to represent the employees in their employment relations with the state, . . ." (§ 3513, subd. (j).) To the extent that the fair share fee has been miscalculated or otherwise represents amounts impermissibly designated for partisan, ideological, or membership purposes, section 3515.8 authorizes the return of that part of the fee.

It is to be anticipated that objecting nonmembers may dispute the manner in which the fair share fee was calculated. It is for this reason that some portion of the fee must be placed in escrow as required by *Ellis* and *Hudson* and suggested in *Keller*.[21] Obviously the Legislature could not have had

---

[21] In *Hudson*, the high court noted that it "need not hold, however, that a 100% escrow is constitutionally required. Such a remedy has the serious defect of depriving the Union of access to some escrowed funds that it is unquestionably entitled to retain. If, for example, the original disclosure by the Union had included a certified public accountant's verified breakdown of expenditures, including some catergories that no dissenter could reasonably challenge, there would be no reason to escrow the portion of the nonmember's fees that would be

either *Ellis* or *Hudson* in mind, as the cases were decided after the statute was enacted in 1982. It is possible the Legislature indeed contemplated a rebate mechanism, because the United States Supreme Court pointed out in *Ellis* that "there is language in this Court's cases to support the validity of a rebate program." (466 U.S. at p. 443 [80 L.Ed.2d at p. 438].) But that does not matter, because the statute does *not* specify any particular procedure. Instead, it directs that the return of the fee shall be "under procedures established by the recognized employee organization." (§ 3515.8.) At best, the statutory language merely suggests a union has the power first to collect the reduced fee before a dissenter may get it back, and indeed such a practice would be permissible if the union placed a portion of the collected fee in an interest-bearing escrow account as endorsed by *Hudson*.[22] In point of fact, as we have noted, the PERB promulgated regulations effective in April 1989 *requiring* fair share fees subject to challenge to be deposited in an interest-bearing escrow. (Cal. Code Regs., tit. 8, § 32995, p. 2066.5.) The regulation, among other things, requires the union to notify the nonmember of the "amount of the agency fee which is to be expressed as a percentage of the annual dues per member based upon the chargeable expenditures identified in the notice." (Cal. Code Regs., tit. 8, § 32992, subd. (a)(1).) As this implementing administrative directive indicates, the provisions of section 3515.8 do not *inevitably* lead to a result at odds with the controlling constitutional principles we have recounted. Plaintiffs' challenge to the facial validity of the refund procedure must fail.

### DISPOSITION

The judgment is affirmed.

Puglia, P. J., and Scotland, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 30, 1990.

---

represented by those categories." (*Hudson, supra,* 475 U.S. at p. 310, fn. omitted [89 L.Ed.2d at p. 249].) In California, under regulations promulgated by the PERB and currently subject to challenge, the union, after having notified the nonmember what percentage the fair share fee represents annual dues assessed members and the basis of the calculation, must place the fees collected from protesting members in an interest-bearing escrow subject to distribution pursuant to an appeal procedure. (Cal. Code Regs., tit. 8, §§ 32991, 32994, 32995, pp. 2066.3-2066.5.)

[22] The California Supreme Court, in considering the agency fee question in the context of the EERA, has held the rights of dissenting nonmembers are protected when amounts reasonably in dispute are escrowed pending resolution of the issue. (*Cumero, supra,* 49 Cal.3d at p. 590.)